G.B. and L.B., on behalf of their minor
child, N.B., and on their own
behalves, Plaintiffs,

v.

TUXEDO UNION FREE SCHOOL
DISTRICT, Defendant.

No. 09–CV–859 (KMK).

United States District Court,
S.D. New York.

Sept. 30, 2010.

Mary Jo Whateley, Esq., Legal Services of Hudson Valley, for Plaintiffs.

Mark Craig Rushfield, Esq., Shaw, Perelson, May & Lambert, LLP, Poughkeepsie, NY, for Defendant.

## OPINION AND ORDER

KENNETH M. KARAS, District Judge:

"G.B." and "L.B." (collectively, "Plaintiffs") bring this action against the Tuxedo Union Free School District ("Defendant," or "the District"), on behalf of their eight-year-old daughter "N.B.," who suffers from autism. The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., requires that children with disabilities be educated with non-disabled children "to the maximum extent appropriate." N.B.'s parents allege that the District violated this mandate by removing N.B. from her mainstream preschool class, and attempting to place her in a special education class made up entirely of students with severe disabilities. N.B.'s parents placed her in a mainstream private school class at their own expense, and are now suing the District under IDEA for, inter alia, reimbursement of N.B.'s tuition. Both parties have moved for summary judgment. For the reasons stated herein, the Court grants Plaintiffs' motion, and denies Defendant's motion.

### I. Background

#### A. Factual Background

N.B. is an eight-year-old girl who has been diagnosed with Pervasive Development Disorder—Not Otherwise Specified (PDD–NOS), a form of autism. (Transcript of Administrative Hearing ("Tr.") 455–46; Tr. 1093; Administrative Record, Parents Ex. ("Parents Admin. Ex.") B., at 1; Administrative Record, District Ex. ("District Admin. Ex.") 28, at 1.)[1] N.B. has

---

1. Before bringing suit in federal court, IDEA requires plaintiffs to submit their claims to an administrative law judge, known as an "Impartial Hearing Officer" (IHO). In this case, the IHO heard six days of testimony and accepted over a hundred exhibits. The Court has reviewed this record, as well as additional evidence which Plaintiffs have submitted. Courts reviewing administrative decisions under IDEA "shall receive the records of the administrative proceedings," and "shall hear additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(C). Under this provision, "[t]he taking of additional evidence is a matter ... left to the discretion of the trial court." *Lillbask ex rel. Mauclaire v. Sergi*, 193 F.Supp.2d 503, 506 (D.Conn. 2002). However, courts generally accept evidence that was not withheld in bad faith, is relevant, and does not change the administrative review into a trial de novo. *See Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir.2003) ("Federal courts reviewing administrative determinations under IDEA must tak[e] into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties."); *Town of Burlington v. Dep't of Educ. of Mass.*, 736 F.2d 773, 790–91 (1st Cir.1984), *aff'd*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (declining

"a mixture of various strengths and weaknesses." (Tr. 1093.) She has difficulty controlling her emotions and struggles with social interaction. (Tr. 1094.) She also has "poor" speech intelligibility and "significant language delay." (State Office of Review Ex. ("SRO Ex.") 1; *see also* Tr. 1094, 1108.)[2] N.B. has displayed "a short attention span, limited eye contact, distractibility, and a high activity level," engaged in "limited interactions with peers and adults," and has "had difficulty transitioning from one activity to another," becoming "agitated at times." (SRO Ex. 1, at the tenth unnumbered page.) Her

strengths include a good memory (Tr. 1094), and the ability to "model[ ] behaviors" she observes (Tr. 1199).

On April 18, 2005, the District's Committee on Preschool Special Education (CPSE) met to develop an Individualized Education Program (IEP) for N.B. for the upcoming 2005–06 school year. (SRO Ex. 4.) N.B. was approximately three and one-half years old at the time. The CPSE determined that N.B. had "significant delays in speech skills, language skills, motor skills, social skills and attentional skills, which interfere with participation in age

---

to require that courts "disallow testimony from all who did, or could have, testified before the administrative hearing," because "a rigid rule to this effect would unduly limit a court's discretion," and instead leaving "[t]he determination of what is 'additional' evidence ... to the discretion of the trial court"); *Plainville Bd. of Ed. v. R.N.*, No. 09–CV–241, 2009 WL 2059914, at *1 (D.Conn. July 10, 2009) ("In determining whether to admit additional evidence beyond the administrative record, a court 'must be careful not to allow such evidence to change the character of the hearing from one of review to a trial de novo.' " (quoting *Jordan S. v. Hewlett Woodmere Union Free Sch. Dist.*, No. 08–CV–1446, 2009 WL 910804, at *2 (E.D.N.Y. Mar. 31, 2009))); *id.* ("The party moving to submit additional evidence must establish that it is relevant and necessary."); *Eschenasy v. N.Y.C. Dep't of Educ.*, 604 F.Supp.2d 639, 649 (S.D.N.Y.2009) (noting that "the Third Circuit has stated that the district court should consider additional evidence that is 'relevant, non-cumulative, and useful' " (quoting *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 760 (3d Cir.1995))); *cf. M.N. v. N.Y.C. Dep't of Educ., Region 9 (Dist.2)*, 700 F.Supp.2d 356, 361 n. 3 (S.D.N.Y.2010) (considering all the "additional evidence submitted by the parties, with the exception of three of Plaintiffs' exhibits," which were irrelevant, contained hearsay, and were not authenticated).

Here, Plaintiffs seek to add nine additional documents to the record. They are: (1) an evaluation of N.B. taken by the District on October 13, 2004 (SRO Ex. 1); (2) progress reports from N.B.'s aides and teachers (SRO

Exs. 2, 3, 6–8); (3) N.B.'s Individual Education Programs from 2005 (SRO Exs. 4–5); and (4) a letter from the chair of the district's committee on special education to N.B.'s mother, to which both parties referred during their testimony before the IHO, (SRO Ex. 9). There is no indication that N.B.'s parents withheld these documents in bad faith, in an effort to "sandbag" the District. Indeed, the District should not be surprised by these documents because it created most of them. Moreover, these documents are relevant, because they chart N.B.'s progress, but do not change the character of this proceeding, because they are brief and largely confirm information that was presented at the administrative hearing. Accordingly, the Court will consider the additional documents. *See Jordan S.*, 2009 WL 910804, at *3 (granting parents' request to submit their child's "non-duplicative report cards and progress reports," as well as an IEP created after the challenged IEP); *Danielle G. v. N.Y.C. Dep't of Educ.*, No. 06–CV–2152, 2008 WL 3286579, at *3 (E.D.N.Y. Aug. 7, 2008) (allowing parents to submit a subsequent IEP); *Eschenasy*, 604 F.Supp.2d at 649 (considering the student's transcripts, even though they "predate[d] the impartial hearing and thus could have been proffered at that time," because "the documents are relevant and useful to the analysis of whether [the student's] emotional problems have affected her educational performance").

2. For example, at thirty-four months, N.B.'s articulation was judged to be around what is expected of a child at twelve to eighteen months. (SRO Ex. 1.)

appropriate activities" (*id.* at 3), and classified her as "a preschool child with a disability," (*id.* at 5). Still, the CPSE decided against placing N.B. in a special education class because, in its opinion, special education was "overly restrictive and [N.B.'s] needs could be met in a less restrictive environment." (*Id.* at 3.) Instead, the CPSE decided to place N.B. in the YMCA's "Y's Beginnings/Little Pals" program, a mainstream preschool. (*Id.* at 2.) The CPSE explained that N.B. "requires a small teacher-to-student ratio with minimal distractions," and, therefore, "would benefit from a small structured preschool or nursery education class to provide her with age appropriate role models in language and social skills." (*Id.* at 4.) On the CPSE's recommendation, N.B. attended the YMCA's "Y's Beginnings/Little Pals" preschool four days a week for two and one-half hours a day, accompanied by a 1:1 aide who helped her keep pace with the class. (*Id.* at 2.) Additionally, the CPSE arranged for N.B. to receive therapy at home. (*Id.* at 1–2.)[3]

N.B. appears to have made positive strides during the 2005–06 school year. The teacher of N.B.'s mainstream preschool class went out of her way to note that N.B. "has made many friends in class," and "is doing wonderfull [sic]." (SRO Ex. 6, at 1, 4.) "I am seeing such an improvement," she continued, "especially in her social skills." (*Id.* at 4.) Likewise, a report from one of N.B.'s tutors noted her linguistic progress. (SRO Ex. 2.) Specifically, it noted that N.B. "initiated naming objects in a purposeful manner, expressively made her needs and desires known," could answer questions regarding her name and age, and was "learning to speak in sentences, such as, 'I want ——.'" (*Id.* at 2.) N.B. continued, however, "to demonstrate difficulty with consistent appropriate eye contact." (*Id.*)

Dawn Sanchez, N.B.'s long-time therapist,[4] witnessed N.B.'s progress during the 2005–06 school year. That year, Ms. Sanchez worked with N.B. twice a week in N.B.'s home, and would occasionally attend N.B.'s school to oversee her teacher and 1:1 aide. (Tr. 407, 1231.) Ms. Sanchez noted advances in N.B.'s social and academic skills. (Tr. 1233.) For example, N.B. demonstrated the ability to count (Tr. 1255), identify objects and body parts (Tr. 1250–51, 1272), and recognize letters and some words, (Tr. 1272–73). "Mrs. B.," N.B.'s mother, also noticed these advancements. She testified that "[t]he children naturally gravitated to N.B. in the preschool," and would fight about "who would get to sit next to N.B. in the classroom at the table for lunch." (Tr. 1439.) By the end of the year, Mrs. B. said that N.B. knew the alphabet, the colors, and the body parts, and could count to fifty. (Tr. 1443–47.)

On June 5, 2006, the CPSE met to review N.B.'s progress during the 2005–06 school year, and to determine her placement for the 2006–07 school year. (District Admin. Ex. 9.) The CPSE issued an IEP that was similar to the last two. The '06–'07 IEP stated that N.B., now age four, had the expressive skills of a two-year-old, and, parroting a report issued two years earlier (SRO Ex. 1), noted that she had "a short attention span, high activity level, distractibility and limited eye

---

**3.** On August 30, 2005, the CPSE met again and issued another IEP. (SRO Ex. 5.) This IEP was nearly identical to the last, also determining that a special education class would be overly restrictive, and recommending that N.B. attend a mainstream preschool instead. (*Id.*)

**4.** Ms. Sanchez holds a masters degree in literacy, is certificated in regular and special education (Tr. 403–04), and has seen N.B. in every school she has attended, (Tr. 405).

contact." (District Admin. Ex. 9, at 4.) The IEP also repeated, verbatim, the 4/18/05 IEP's finding that N.B. has "significant delays in speech skills, language skills, motor skills, social skills and attentional skills, which interfere with participation in age appropriate activities." (*Id.* at 3.) The '06–'07 IEP found that N.B. needed to improve, inter alia, language skills, social interaction with peers and adults, cooperative play skills, and frustration tolerance. (*Id.* at 4–5) The CPSE again determined that N.B. "would benefit from a small structured preschool or nursery education class to provide her with same age appropriate role models in language and social skills" (*id.*), and again declared that "a special class program ... was rejected" because "it would be overly restrictive and [N.B.'s] needs could be met in a less restrictive environment," (*id.* at 6). The portion of the IEP that directs the CPSE to explain "the extent, if any, to which the student will not participate in general education programs" reads "Not Applicable." (*Id.* at 3.) Yet, in an apparent contradiction, the IEP states that N.B. "will attend the Fred S. Keller School for the 2006/07 school year," and "start in a

self-contained classroom." (*Id.* at 5.) The IEP added that "[s]hould it be appropriate to move to an integrated classroom, the Committee will hold a meeting and document the change to reflect that recommendation." (*Id.*)[5] The IEP never stated that placement in a mainstream classroom would be inappropriate, much less explained why that might be the case. (District. Admin. Ex. 9.)[6] The IEP also provided N.B. with home therapy.[7]

The District's testimony has not explained why the CPSE decided to place N.B. in a self-contained classroom for the 2006–07 school year. In fact, there is even a dispute about *whether* the CPSE actually decided to place N.B. in a self-contained class for the 2006–07 year. Nancy Teed, who chaired every CPSE meeting regarding N.B. (Tr. 82), testified that Mr. and Mrs. B. agreed to place N.B. in the Keller School, with full knowledge that the class consisted solely of disabled students. (Tr. 87–88, 131–32, 608–23.) Ms. Teed said that Keller was planning on integrating N.B.'s class as soon as it received the necessary state certification. (Tr. 256–57, 335–36.) But, she noted, pursuant to

---

5. A "self-contained" classroom is one comprised only of disabled students, whereas an "integrated" classroom is one containing both disabled and non-disabled students. (Tr. 260, 503, 1428.)

6. A report issued on October 13, 2004, when N.B. was approaching her third birthday, stated that N.B. "would benefit from a small structured full day special education class." (SRO Ex. 1.) Plaintiffs have submitted this report to the Court, but Defendant argues that the Court should not consider it because it was not submitted to the IHO. (Def.'s Mem. of Law in Opp. to Pls.' Mot. for Summ. J. and in Supp. of Def.'s Cross–Mot. for Summ. J. ("Def.'s Mem.") 3–7.) Needless to say, Defendant does not rely on this document, and no defense witness testified that that recommendation formed part of the basis for the CPSE's decision to put N.B. in a self-contained class. Nor did the issuer of this report, or any one

else for that matter, explain the basis for this statement. Accordingly, while the Court considers this statement, it gives it little weight.

7. The CPSE met twice more in 2006 to discuss N.B.'s placement, on August 15, 2006, and October 3, 2006. After both meetings, the Committee issued IEPs that were nearly identical to the 6/5/06 IEP. (District Admin. Exs. 13, 19.) Specifically, both the 8/15/06 and the 10/3/06 IEPs repeated the 6/5/06 IEP's anomaly of simultaneously recommending a special education class and stating that such a class was rejected as overly restrictive. (District Admin. Ex. 13, at 5; District Admin. Ex. 19, at 6) Both also repeat the error of responding "Not Applicable" to the portion of the IEP that directs the Committee to explain "the extent, if any, to which the student will not participate in general education programs." (District Admin. Ex. 13, at 3; District Admin. Ex. 19, at 3.)

N.B.'s IEP, Keller "was to inform [Teed] if they in fact were ... mov[ing] to a formal integrated classroom." (Tr. 261.) If that occurred, Ms. Teed would have reconvened the CPSE to determine whether an integrated class was appropriate for N.B. (Tr. 269.) But, the class was not integrated while N.B. was there, at least according to Ms. Teed. (Tr. 261.)

Mrs. B. tells a different story. She attended all her daughter's 2006 CPSE meetings, and testified that the Committee never discussed placing N.B. in a self-contained class. (Tr. 1628–29.) The reason the Committee did not discuss whether it was necessary to place N.B. in a self-contained class, according to Mrs. B., is because it was not. (Tr. 1614.) Instead, Keller was chosen precisely because it was supposed to be integrated a few weeks after N.B. joined the class. (*Id.*) Mrs. B swore that "I never would put [N.B.] in a self-contained program that was going to be there forever. It was a couple of weeks, that's what they told me." (*Id.*) Mrs. B. stated that both Ms. Teed and Dr. Robin Nuzzolo, the director of the Keller school, understood that it was Mrs. B.'s intent for N.B. to be in an integrated class, and told her that N.B.'s class would be integrated within three weeks of her arrival. (Tr. 516–17, 520.) [8] According to Mrs. B., N.B.'s class at Keller appeared to be integrated in October 2006. (Tr. 517, 545, 1428.)

Mrs. B's account is corroborated by several other witnesses who testified in front of the IHO. Dr. Nuzzolo testified that Keller intended to open an integrated 12:1:2 class (twelve students, one teacher, two teaching assistants) at the Rockland campus in the fall of 2006. (Tr. 617–20.) [9] Because Mr. and Mrs. B. were interested in such a class, Dr. Nuzzolo invited the couple to visit an integrated 12:1:2 class which Keller was already running at its Westchester campus. (Tr. 619–20.) State certification is necessary to run such a class, however, and Keller did not expect to receive it until October or November 2006. (Tr. 618, 645.) Dr. Nuzzolo was charged with making the ultimate determination as to whether a student is an acceptable candidate for one of Keller's programs. (Tr. 620–21.) Dr. Nuzzolo testified that N.B. was a candidate for the integrated 12:1:2 class, but was placed in the self-contained 6:1:2 class because the state had not yet given Keller the go-ahead on the integrated class. (Tr. 621–23.) Still, Dr. Nuzzolo told the IHO that "[t]he students that [sic] we selected for [N.B.'s] classroom, ... were all going to then be students that would transition into the 12:1:2 once we got that permission from the state to open up that classroom." (Tr. 622–23.) Indeed, Dr. Nuzzolo and her team selected N.B. for the class "because that was the class that [Keller] had targeted to become an integrated class," and the

8. On cross-examination, defense counsel confronted Mrs. B. with the fact that the August 15, 2006 IEP stated that "[s]hould it be appropriate to move to an integrated classroom, the Committee will hold a meeting and document the change to reflect that recommendation." (District Admin. Ex. 13, at 5.) Mrs. B. stated that she did not think that would apply to N.B.'s class being integrated because "it's not a move to another classroom, it was the class that was already existing [being] changed into an integrated class" and that "was the intent" all along. (Tr. 1624–26.)

"Obviously I have learned now I have to be picky about the wording on everything," she added, "but I wasn't that picky about it. Everyone discussed [N.B.'s class being integrated within three weeks], that's what they said. I didn't think it was a big issue." (*Id.*)

9. Dr. Nuzzolo holds a Ph.D. in Applied Behavioral Analysis from Columbia's Teachers' College, has published several papers on autism, and has extensive experience working with children with disabilities. (Tr. 586–92.)

team believed it was "appropriate" for N.B. to be in an integrated class. (Tr. 641–42.) Dr. Nuzzolo insisted that this information was "absolutely" relayed to Ms. Teed and Mr. and Mrs. B. (Tr. 623.)

As it happened, Keller did not receive the desired certification until October 2007 (over one year after N.B. was placed at Keller). (Tr. 646.) In the meantime, however, N.B.'s class at Keller was effectively integrated. Keller combined four of its non-disabled day care children (including Dr. Nuzzolo's own daughter) with N.B.'s class of six disabled students, for the entire day save for half an hour. (Tr. 647–48, 659.) This began in the fall of 2006, just as N.B. was starting at Keller. (Tr. 648.) During this time, the typically-developing students were used "as models for children with disabilities," and all of the children were given the same work. (Tr. 660.) Thus, while the classes were not formally integrated, according to Dr. Nuzzolo, "[i]n reality the kids were together and having a good time." (Tr. 650.)

Other witnesses also testified that N.B.'s class at Keller was effectively integrated. Mindy Rothstein, who taught N.B.'s class at Keller, stated that the class "was considered an integrated setting meaning that we mixed kids with and without disabilities." (Tr. 665.) Likewise, Dawn Sanchez noted that, when she visited N.B.'s class at Keller, it appeared to be integrated. (Tr. 503.)

Ms. Teed's claim that N.B.'s class was not integrated to her knowledge (Tr. 269) is not only refuted by the above mentioned testimony, it is also undermined by Ms. Teed's own notes. Ms. Teed observed N.B.'s class on November 20, 2006, and filled out a classroom observation report. (District Admin. Ex. 51.) On the line next to "Class Size," she wrote "10," and, at the top of the page, she wrote "Integrated Class." (*Id.*) Still, at the hearing, Ms. Teed insisted that the class was not integrated to her knowledge, explaining to the IHO: "I don't know why I wrote ["integrated"]. I believe it was because that was the class they were trying to push to become integrated." (Tr. 261–62.) Likewise, Ms. Teed swore that she observed only six students in N.B.'s class, but wrote "10" because N.B.'s class was "moving towards" becoming a ten-student class. (Tr. 268–70, 334–35.) One thing is clear: during N.B.'s four months at Keller (September–December 2006), no one ever complained that N.B. was inappropriately being educated along side typically-developing children—not Ms. Teed, not Dr. Nuzzolo (whose typically-developing daughter was apparently in N.B.'s class), not N.B.'s teacher, Ms. Rothstein, not any of N.B.'s aides, and not N.B.'s parents. In fact, Ms. Rothstein believed that N.B. "learned a lot" while at Keller. (Tr. 738.) [10]

While N.B.'s parents were happy that Keller did not keep her totally isolated from typically-developing children, they had other complaints about the Keller school. (Tr. 521–22.) Most significant is Keller's failure to provide N.B. with a 1:1 aide to accompany her to class, despite the fact that N.B.'s teacher reportedly recommended such an aide. (Tr. 1490.) Ms. Sanchez, who worked with N.B. the entire time she was at Keller and observed N.B.'s class on at least one or two occasions (Tr. 1283–87), testified that this lack of individual attention was harmful to N.B. Ms. Sanchez testified that she watched N.B.'s

---

10. Specifically, Ms. Rothstein testified that she thought N.B. "benefit[ted] from our instruction. Clearly her inappropriate behaviors decreased and … even though she did not show progress in various areas, I still think she had learned a lot." Further, Ms. Rothstein stated that she has certainly "seen other students not make as much progress as [N.B.]" (Tr. 738.)

teachers at Keller ignore N.B.'s crying and hair-pulling for fifteen minutes, apparently because they believed it was an attention-seeking device. (Tr. 411–12, 428–29, 1284–86.) An individual aide would not have ignored N.B.'s hair-pulling, Ms. Sanchez asserted, instead he or she would have attempted to figure out its cause (e.g., too much work, not enough movement, etc.). (Tr. 1285–86.) Similarly, Ms. Sanchez observed "free play" time at Keller, in which other students were playing dress-up and "N.B. didn't seem to really know what to do." (Tr. 412.) Ms. Sanchez "didn't see at that time any assistance from an aide or a teacher to kind of support her to be able to engage in what the other kids were doing." (*Id.*) Accordingly, Ms. Sanchez did not believe that Keller was an appropriate placement for N.B. (Tr. 1292.)

Whatever the reason, N.B. appeared to be very unhappy at Keller. According to both Mrs. B. and Ms. Sanchez, "[N.B.] typically . . . loved going to school." (Tr. 1289–90; Tr. 1480–81.) But, just three weeks after starting at Keller, N.B. began to protest school. (Tr. 1481.) Each morning, when Mrs. B. would take the exit for Keller, N.B. would say "no, no." (Tr. 1480.) Sometimes, N.B. would refuse to get out of the car in the Keller parking lot. (Tr. 1480–81.) Ms. Sanchez testified that she saw this occur: "I'd meet [N.B. and Mrs. B.] in the [Keller] parking lot and . . . I would see [N.B.] come out of the car crying, throwing herself on the floor saying no school." (Tr. 1289.) According to Mrs. B., this behavior continued until N.B. left Keller in December 2006. (Tr. 1481.) Mrs. B. later explained that, in deciding to pull N.B. out of Keller, "I wasn't trying to make anybody's life more difficult, I was just trying to find a program for [N.B.] . . . I wanted life to be easy for her . . . that's all." (Tr. 1486–87.)

Ms. Teed provided Mrs. B. with a list of pre-approved schools in the area, but she rejected them because none offered full-day, integrated classes. (Tr. 1697–1700.) So, Mrs. B. searched every school within a sixty-mile radius for one with a full-day integrated program. (Tr. 1699–1700.) Eventually, Mrs. B. found Montclair State University Preschool, which offered N.B. an integrated program with a 1:1 aide. (Tr. 908, 1294, 1487.) Before N.B. could start at Montclair, she had to meet and be evaluated by the school's occupational therapist, speech therapist, and special education teacher. (Tr. 1488.) The evaluation was necessary because Montclair only accepts disabled students who are "high functioning" and "appropriate" for their desired program, according to Mrs. B. (Tr. 1488–89.) After evaluating her, Montclair accepted N.B. into an integrated class. (Pls.' Rule 56.1 Statement ("Pls.' 56.1") ¶ 38.) Mrs. B. telephoned Ms. Teed on January 10, 2007, to inform her that Mrs. B. removed N.B. from Keller effective January 2, 2007, eight days earlier, and that she intended to enroll N.B. at Montclair by the end of January 2007. (SRO Ex. 9; Tr. 167.)

N.B. reportedly flourished at Montclair. Ms. Sanchez observed N.B.'s class occasionally and spoke with N.B.'s teachers from time to time. (Tr. 1293–94, 1297–98, 1299.) She observed N.B., with the help of her 1:1 aide, interacting with the non-disabled children in the class. (Tr. 1294.) With help from the aide, N.B. was "learning a lot," "learning new words that [Ms. Sanchez] had never heard," and was better able to engage and communicate with her peers. (Tr. 1299–1300.) N.B.'s 1:1 aide worked with her "the whole time," and would "modify" the teacher's lessons for N.B. in order to "keep it at her level." (Tr. 1295–97.) For example, Ms. Sanchez observed the class when it was learning about pyramids. (Tr. 1296.) N.B.'s aide drew a triangle on a dry erase board and explained to N.B. that this is what a pyra-

mid is, and would break off with N.B. for further explanation when necessary. (*Id.*)

Ms. Sanchez also observed N.B.'s social progress at Montclair. N.B. was reportedly "speaking a lot, and "engag[ing] with other kids a lot." (Tr. 1299.) According to Ms. Sanchez, N.B.'s progress at Montclair made it "a lot easier" for Ms. Sanchez to teach N.B. to engage in social interactions outside of school. (Tr. 1299.) Similarly, Mrs. B., who frequently observed N.B. at Montclair (Tr. 1490), noted N.B.'s 1:1 aide's success in fostering social interactions between N.B. and her peers. (Tr. 1493–95.) N.B. was happy at Montclair, according to her mother, and she stopped screaming "no" when it was time to go to school. (Tr. 1494.)

Reports of N.B.'s success at Montclair have not just come from her mother and her special education teacher; N.B.'s progress report, issued by Montclair on May 22, 2007, was also positive. (SRO Ex. 7.) The report noted that, while N.B. still sometimes sucked her thumb and pulled her hair, she "respond[ed] well to the structure of teacher-directed activities." (*Id.* at 1.) And, despite still struggling to sit up straight for extended periods of time, N.B. learned to climb, kick, somersault, and ride a tricycle. (*Id.*) N.B. stopped throwing materials. (*Id.*) She picked books off the shelf and asked adults to read them to her, and "demonstrate[d] the ability to begin one- to two-step directions." (*Id.*) "When she's not sure what to do, she watches her peers to get the starting idea," the report stated. For example, "when the children were making wet tissue paper birthday cakes in cups, she watched peers and then imitated their first step (i.e., put paper in the cup)."

(*Id.*) Likewise, "when patting knees/clapping hands was introduce [sic] at the start of a music group, she watched the adult and peers, and initiated the sequence the following week." (*Id.* at 2.) Socially, N.B. would "approach[ ] and engage[ ] in activities next to peers, for varying periods of time. She [wouldn't] avoid or flee peers." N.B. would "look[ ] at what [her peers did] with materials and (if it look[ed] interesting to her) she [would] tr[y] to imitate their ideas." (*Id.*) N.B.'s communication skills improved: "She knows [when] she is being asked a question and that she needs to respond to it." (*Id.* at 3.) She would often answer correctly, though she "require[d] visual and contextual support." (*Id.*) For example, N.B. "respond[ed] to questions such as 'who is coming' (mommy), and 'who is at the door' (she looks at the door and identifies a peer's mother)." (*Id.*) "When asked, 'what number is that' [in your hand], she responds correctly, 'six.'" (*Id.*) "When asked, 'who moos,' she responds, 'cow.' When asked,' what color is the train, 'she answers with the appropriate color." (*Id.*) At that time, N.B.'s expressive language was at about a two-word level, which she was able to use "to request actions that she wants, i.e., 'squeeze me,' 'push me,' 'push swing,' 'push chin,' 'read book,' 'sit knee.'" (*Id.* at 3–4.)[11]

On August 7, 2007, the District's Committee on Special Education (CSE), also chaired by Ms. Teed, met to develop N.B.'s IEP for the 2007–08 school year. (District Admin. Ex. 28.) The '07–'08 IEP noted N.B.'s progress at Montclair, reporting that she had "mastered reading all uppercase and lowercase letters," was able "to sequence two pictures," and follow one-step directions. (*Id.* at 3.) N.B. also "mas-

---

11. In June 2007, Montclair issued another report regarding N.B., which the IHO received into evidence. (District's Admin. Ex. 76.) This report described N.B.'s program (*id.* at 1–3), and her individual goals and the school's strategies for achieving them, (*id.* at 5–10). It also repeated most of the May 22, 2007 evaluation, only with more detail. (*Id.* at 4, 11–31.)

tered cleaning up two items at a time," and was "beginning to learn phonics and foundational words." N.B. then could "sustain[ ] eye contact more consistently with her teachers and peers during social interactions, but need[ed] prompting at times." (*Id.*) N.B. had "learned to work with all of her teachers and sit for the duration of the instruction." (*Id.*) Although the IEP repeated the concern that N.B. suffers from "a short attention span, high activity level, distractibility, and limited eye contact," it noted that she was "improving." (*Id.*) Still, the IEP reported that N.B. demonstrates "a mixed sensory reactivity to her environment" and "significant language delays." (*Id.*) The IEP recommended that N.B. improve her language skills, social skills, attention span, and eye contract. (*Id.*) It also repeated the observation of past IEPs that N.B. had "significant delays in speech skills, language skills, motor skills, social skills and attentional skills, which interfere with participation in age appropriate activities." (*Id.*)

Over the opposition of N.B.'s parents, the CSE recommended N.B. join a self-contained 8:1:2 class (i.e., eight disabled children, one teacher, two assistants). (*Id.* at 1; Tr. 913.) The IEP explained that N.B. "require[d] special instruction in an environment with a smaller student-to-teacher ratio and minimal distractions in order to progress in achieving the learning standards." (District Admin. Ex. 28, at 2.) Under the heading "Other Options Considered," the IEP noted that "[t]he Committee considered a general education setting with support services," but rejected it "because [N.B.'s] current academic functioning, social needs, physical needs and language processing needs indicates [sic] that a more intensive setting with support is needed to address [N.B.'s] needs." (*Id.* at 7.)

Asked about the 8/7/07 IEP, Ms. Teed explained that the CSE had set up an appointment for N.B. with officials from the Rockland BOCES program and that the officials informed the CSE that they thought N.B. would be appropriate for their program. (Tr. 909–12.) The Committee rejected N.B.'s parents' request that she continue in an integrated classroom, Ms. Teed testified, because it felt the BOCES class was "the most appropriate placement to meet [N.B.'s] needs." (Tr. 914–15.) "As opposed to a fully integrated program," Ms. Teed continued, "the 8:1:2 [self-contained] program would provide different models of instruction, individualized instruction, [and] opportunities for therapists to work with [N.B.] within her setting." (Tr. 915.) Ms. Teed later noted that the Committee "definitely" considered the need to deal with N.B.'s distractibility, and determined that in a smaller group setting it would be "more manageable." (Tr. 936–37.) Ms. Teed then reiterated the Committee's view that the BOCES program was "the most appropriate program for N ... [d]ue to the small size of the program, the structured parts of that program, [and the] opportunities that program provided for N.B. to learn and grow, [and] meet her needs." (Tr. 937–38.) Elsewhere in the record, Ms. Teed gave the same explanation of the CSE's decision to send N.B. to BOCES, insisting that it would "get [N.B.] the attention and support and direction that she required," and would "accommodate and address N.B.'s needs educationally." (Tr. 105–07.) The IEP did recommend that N.B. be in a mainstream physical education class, but did not state how often it should be taught. (Tr. 952; District Admin. Ex. 28, at 2.)

The IHO also took testimony from Dr. Peter Blechman, assistant principal of Rockland BOCES. Dr. Blechman and his colleagues met with N.B. and her parents for just under an hour in the spring of 2007. (Tr. 819–20.) After that meeting,

Dr. Blechman and his team determined that N.B. "seemed to fit the profile" for the BOCES special education class. (Tr. 821.) Dr. Blechman recommended his BOCES program to the CSE for N.B. because he thought it "was the best program for her." (Tr. 823–24.) Dr. Blechman indicated that he could not recall whether N.B. had been in an integrated classroom before August 2007 (Tr. 831–32), but stated that, even if he had known that N.B. had been successful in an integrated classroom, that would not change his recommendation of a self-contained classroom. (Tr. 832–33.) Dr. Blechman told the IHO that the class which he recommended for N.B. was intended for disabled children who "are able to be in a regular school." (Tr. 790.) It appears that Dr. Blechman believes that a self-contained class is still better for these children because "we found that just being in a regular school puts pressures on a [disabled] child." (*Id.*)

Both Ms. Teed and Dr. Blechman emphasized the amount of contact with non-disabled students that N.B. would have had at BOCES. (Tr. 114–16, 119, 368–69.) Non-disabled students would attend the same school as N.B. (Tr. 809), would attend the same assemblies, and have lunch in the same cafeteria. (Tr. 368–69, 817) N.B.'s class would also visit mainstream classes for play time (Tr. 866), and mainstream fourth grade students would visit N.B.'s class to read to the children, (Tr. 369). Still, Dr. Blechman admitted that, in the typical day, N.B. would have only been integrated for lunch. (Tr. 817.) And, the disabled children "eat at their own table," and "are mostly focused on eating their meal." (*Id.*) Dr. Blechman assured the IHO, however, that the disabled children "do hear the sights and sounds of the cafeteria." (*Id.*)

Despite being aware at least of the fact that N.B. spent the past semester in an integrated class at Montclair, and despite receiving a progress report from Montclair (District Admin. Ex. 76), the CSE did not state why, or even whether, the Montclair placement was inappropriate. Ms. Teed told the IHO that "[t]here weren't any drastic changes in [N.B.'s] needs," between the October '06 IEP and the August '07 IEP, and that, in fact, N.B.'s needs remained "very similar." (Tr. 107.) This confused and frustrated N.B.'s parents. (Tr. 1534.) Mrs. B. explained: "I never understood where [the decision to put N.B. in a self-contained class] came out of, why we were suddenly taking a child who was integrated [and] putting her in a self contained [class]." Mrs. B. continued: "I don't know why they decided that. It wasn't like she had any challenging behaviors that changed that we needed to put this child in a self-contained classroom." (*Id.*)

N.B.'s parents rejected the CSE's recommendation that N.B. attend BOCES for the 2007–08 school year, instead electing to pay out of their own pockets to keep N.B. in her integrated Montclair class. By December 2007, however, Mr. and Mrs. B. could no longer afford Montclair. (Tr. 1513, 1516.) So, the parents moved N.B. to the Suffern Montessori School, which was more affordable. (Tr. 1516–17.) Montessori offered an integrated classroom containing five to twenty students, depending on the time of day. (Tr. 1517–19.) Mrs. B. hired a teaching assistant to accompany N.B. to Montessori, and fulfill the role that her 1:1 aide played at Montclair. (*Id.;* Tr. 908.) From observing class and seeing N.B.'s improvement, Mrs. B. was highly satisfied with Montessori. (Tr. 1519–1526.) N.B. "developed some really nice relationships with . . . at least three of the kids in the class," her mother reported. (Tr. 1520.) One little girl would often come up to N.B. and the two would say "hi" and hug. (Tr. 1520.) N.B. also

took a liking to twin boys. (Tr. 1521–22.) Mrs. B. saw the boys "riding their tricycles around and [N.B.] . . . running after them laughing [and] trying to interact with them." (Tr. 1521–22.) Such interactions with typically-developing children were important because "N.B. does a lot by watching first," her mother explained, "she will watch you and most people don't realize she is taking it all in but she is." (Tr. 1522.) For example, Mrs. B. saw N.B. watching this little girl playing with "this marble thing, [where] you have to push up the lever and the marble goes down." N.B. watched the little girl, and then she did it herself. (*Id.*) Mrs. B. has observed great improvement in N.B.'s socialization and independence while at Montessori, especially "the socialization skills that she [got] from being with [non-disabled] kids." (Tr. 1523.) "[Y]ou can't get that in any other environment," Mrs. B. asserted. (*Id.*) Ms. Sanchez also believes that N.B. benefitted from Montessori, stressing the utility of the integrated classroom plus 1:1 aide model. (Tr. 1308.) In Ms. Sanchez's opinion, N.B. was able to function and learn in that environment. (Tr. 450.) In particular, Ms. Sanchez noted that N.B.'s vice of pulling out her own hair when frustrated decreased to the point that Sanchez almost forgot that it had ever occurred. (Tr. 1310.) In fact, the day before her testimony, Ms. Sanchez told N.B. "how nice her hair looked" because it was the first time Sanchez has seen N.B. without some hair missing. (*Id.*)

Academically, Ms. Sanchez reported that: "[N.B.'s] writing words, she's doing math concepts, early graphing, things that the other kids are doing. . . . [T]he teacher gives [N.B.] the same work she gives the other kids and the assistant works with her and she's doing it. She's starting to read, her handwriting has come so far." (Tr. 1306.) And, socially, Ms. Sanchez noted that N.B. befriended two little girls in particular. (Tr. 1304.) Ms. Sanchez twice saw N.B. walk up to these girls, say "hi" and "friend," and take them by the arm. (*Id.*) This type of proactive social interaction was something Ms. Sanchez had "never seen [N.B.] do ever." (Tr. 1305.) According to Sanchez, these were "huge strides." (Tr. 1306.)

The IHO also heard extensive testimony from Dr. Philip DeFina, a neuropsychologist whose professional credentials are too long to repeat in their entirety.[12] Mr. and Mrs. B. retained Dr. DeFina in November 2007 to evaluate N.B. (Tr. 1089.) He interviewed N.B.'s parents, and did a behavior analysis of N.B. (Tr. 1089.) He then conducted neuropsychological testing on N.B. and ordered a specialized electrical brain mapping study and interpreted the data. (*Id.*) He has met with N.B. several times since, and has supervised a neurofeedback intervention program for her. (Tr. 1090.)[13] Dr. DeFina told the IHO that the "hallmark feature of [N.B.'s] disability" is difficulty with "social and emotional development," and that "right now she is at a critical time developmentally

12. Dr. DeFina earned a B.A. and a Masters in educational psychology from New York University, two doctoral degrees in neurophysiology from Fielding Graduate University and Louisiana State University, respectively, and a post-doctoral degree in neuropsychology from Columbia University. (Tr. 1078–79.) Dr. DeFina is now the president of the American Board of School Neuropsychology, a professor at NYU's Medical School, and the chief consultant for the Castle Institute of Rehabilitation Traumatic Brain Injury Program. (Tr.

1080–81.) He has taught and guest lectured at the University of Maryland, John's Hopkins, and Harvard. (Tr. 1083–84.) Dr. DeFina also has published extensively on learning disabilities. (Tr. 1085–87.) At the time of his testimony, Dr. DeFina was finishing a book on autism. (Tr. 1085.)

13. Dr. DeFina issued a report, which Plaintiffs submitted to the IHO. (Parents Admin. Ex. B.)

with regard to emerging reciprocal social skills and being able to develop appropriate interaction socially." (Tr. 1110.) Dr. DeFina explained that psychologists stress social skills for autistic children because their "ability ... to learn is directly connected to [their] ability to link to people." (Tr. 1152.) In fact, N.B. was then "at a critical stage" where she needed "good role models" to "interact with in order to develop appropriate social skills." (Tr. 1123.) Because "modeling behaviors" she observes is one of N.B.'s strengths (Tr. 1199), Dr. DeFina testified that it is "very critical" to "put her into a program where there are ... neurotypical kids in which [she] can model appropriate social types of interactions," (Tr. 1110). "In fact," he continued, "she has been able to do that and most recently she is starting to initiate interactions with her peers." (*Id.*) Dr. DeFina emphasized his support for an integrated program, calling it "paramount based on her diagnosis," "very important in overall learning," the "best in [N.B.'s] particular case," and certainly "appropriate for her." (Tr. 1152.) [14]

For these reasons, Dr. DeFina shared Ms. Sanchez's and Mrs. B's esteem for the Montessori program. (Tr. 1147–48.) "If you combine the structure of the Montessori School," he explained, "with the interactive component of having multiple children, I think that would be more conducive to learning for a child like [N.B.]." (Tr. 1148.) Having "kids without disabilities within that environment for role modeling is I think probably one of the best aspects of the [Montessori] program," he added.

(Tr. 1147–48.) By contrast, Dr. DeFina testified that a self-contained class like BOCES, which only integrates disabled children for lunch, gym, and play-dates, would be inappropriate for N.B. (Tr. 1124–25.) "You would want to maximize her exposure to" typically-developing children, "not minimize it," he insisted. (Tr. 1125.) Such a program would allow only "minimal interaction for learning." (Tr. 1205.)

On cross-examination, the District challenged Dr. DeFina on the benefits of educating autistic children in integrated classrooms, asking him whether integrated programs are "really only for the social skills"? (Tr. 1203.) Dr. DeFina responded that there is a "whole process of learning" that occurs in "the classroom environment." (*Id.*) N.B. "needs to develop eye contact," the ability "to approach people with the right distance," and "the right intonation of voice." (Tr. 1204.) "If you learn how to do something but you can't apply it with others, you are still not very functional," Dr. DeFina continued, so "learning within the milieu of your peers is more in line with what [N.B.] needs holistically." (Tr. 1204.) "I think kids learn from their peers," he added. (Tr. 1206.) The District's counsel pounced on this last comment, quipping, "[t]hat's perhaps true in college," and asking, "[h]ow about at the kindergarten level?" (*Id.*) The professor did not back down, explaining that "the things children do in relation to instruction other kids pick up on. The reinforcement that they get for the positive behavior is something that ... is a model for other kids." (*Id.*) [15]

---

**14.** Ms. Sanchez agreed with this assessment (Tr. 1306–07), noting N.B.'s ability to learn from her peers, (Tr. 425–26).

**15.** This was not the only time the District's counsel seemed to question the benefits of mainstreaming in general. At one point, counsel attacked the basis for Mrs. B.'s assertion that "kids learn when in an integrated model." (Tr. 1650–51.) Later, in response to

Mrs. B.'s testimony that attending an integrated classroom helps N.B. develop relationships with peers, counsel asked whether "[N.B.] could not have developed personal relationships with disabled students" in a self-contained class. (Tr. 1668–89.) Though not a psychologist, Mrs. B. explained that it is "there is an ebb and flow to conversation and typical children are fast and they respond

The District's counsel also suggested that an integrated environment might be detrimental to a child like N.B. who has a short attention span, asking "wouldn't putting [N.B.] in an integrated setting with all the noise, all the interactions in a typical kindergarten classroom, wouldn't that really overwhelm her?" (Tr. 1198.) "The short answer is 'no,'" the doctor responded. (Tr. 1200.) "We can all sort out with the noise a lot of information and sometimes it's misleading to think that a noisy environment is not therapeutic," he stated. (*Id.* at 1199.) Learning "by modeling" is "something that [N.B.] does very well, and having her in an environment where she can be modeling" is "really ... important." (*Id.*) Dr. DeFina compared N.B.'s counterintuitive learning-style to people who "listen to a background radio when they are doing their homework" and are thus "more able to focus." (Tr. 1132–33.) So it is with N.B.: "When she is confined to a space where there is no sensory input, she actually shuts down or becomes very, very anxious." (Tr. 1133.)

This is not to say that N.B. can succeed in an integrated classroom all by herself. Instead, Dr. DeFina testified that N.B. needed a 1:1 aid to direct her "on a continuous basis." (Tr. 1127.) "[Y]ou can't get away with having this done within the context of a classroom situation in which there are one or two aides with a group of kids," he insisted, "the aide needs to work with her constantly." (*Id.*) "Having one consistent relationship with an adult has been demonstrated to be the most efficient way of dealing with kids with severe learning and behavioral needs." (Tr. 1128.) Therefore, a 1:1 aide "is paramount" and "probably one of the top things on the list." *Id.* Likewise, Ms. Sanchez and Mrs. B. also testified that a 1:1 aide has been essential to N.B.'s development. (Tr. 436–37, 440–41, 556–58.)

## B. Procedural History

On May 7, 2007, N.B.'s parents filed a due process complaint seeking reimbursement for the cost of sending N.B. to Montclair, and requesting a hearing in front of an impartial hearing officer. (IHO Ex. 1.) [16] The due process complaint noted that N.B. had attended "a neuro-typical preschool" prior to the 2006–07 year, and alleged that "it was agreed by all of the special education professionals present" at the 2006 CPSE meetings, "that NB needed to be in a *full day, integrated program.*" (*Id.* at 4–5.) The complaint alleged a number of shortcomings in the Keller program, including that it used the "Applied Behavioral Analysis" (ABA) technique, as opposed to one that focuses more on providing N.B. with "sensory input" (*id.* at 5–6), that it conducted N.B.'s speech lessons "in the gymnasium in a corner cubicle set up

fast." (Tr. 1669.) "You have to respond fast to [N.B.]," her mother told the District's attorney and the IHO, "you can't respond five minutes later.... She needs [a fast] response in order for her to get the interaction." (Tr. 1670.)

16. On August 21, 2007, N.B.'s parents requested a formal determination of N.B.'s "pendency" placement and services. IDEA prevents school districts from altering a student's placement or services during the pendency of a due process proceeding. *See* 20 U.S.C. 1415(j). The 8/7/07 IEP had reduced N.B.'s therapy sessions and directed that they take place at the BOCES school. (IHO Ex. 10, at 5.) Because N.B.'s parents filed a due process complaint prior to N.B.'s 8/7/07 IEP, the IHO ruled that the District had to provide N.B. with the services specified in the 10/3/2006 IEP. (*Id.* at 5–6) Thus, the IHO ordered the District to provide N.B. with increased therapy services (e.g., occupational therapy, physical therapy, etc.) to reflect those provided under the 10/3/06 IEP. (*Id.*) The IHO further required the District to provide those services at either N.B.'s home or an office location, as opposed to solely at the BOCES school, as contemplated by the 8/7/07 IEP. (*Id.*)

under an enormous heating vent" (*id.* at 7), and that N.B. was given cookies in violation of her strict sugar-free diet, (*id.*). The due process complaint alleges that a number of other small requests for individual accommodations were denied. (*Id.* at 9.) The complaint avers that the District offered to let N.B. leave Keller, but only if she attended a school on a list provided by the District, "none of [which] had a full day integrated program." (*Id.* at 8.) [17] The complaint alleges that N.B. "clearly needed" an integrated program and that it was "counter-productive" for N.B. to continue at Keller. (*Id.* at 9–10.) Thus, N.B.'s parents placed her at Montclair because it was "[t]he only other appropriate school we could identify for NB with a full-day integrated learning program using sensory-based learning." (*Id.* at 10.) The complaint concludes with Mrs. B.'s assertion that "NB has a one-on-one teaching assistant who works with her on a daily basis at the Montclaire [sic] school, and as NB's mother, I have noticed a dramatic improvement." (*Id.* at 11.) The complaint's proposed solution was that N.B. "[c]ontinue [her] program at Montclaire [sic] with tuition reimbursement." (*Id.* at 3.)

The District's response justified N.B.'s placement by asserting that N.B. improved at Keller, but still needs to "develop prerequisite skills in order to be able to function in larger group settings." (IHO Ex. 4.) The District further noted that "other NYS approved preschools were considered and rejected as Mrs. [B.] was unwilling to consider a non-integrated classroom setting." (*Id.*) N.B.'s parents sent a second impartial hearing request on November 12, 2007, seeking to amend their first due process complaint to challenge N.B.'s 2007–08 placement as well. This second complaint attacked N.B.'s 2007–08 placement because, inter alia, it "fail[ed] to provide for any mainstraming," which was inappropriate since N.B. "functions adequately in an integrated classroom environment and models effectively from non-disabled students." [18] (IHO Ex. 2, at 4.) The second complaint also claimed that N.B. "should be within an integrated classroom," and that she "requires a one to one aide." (*Id.* at 5.) The District's attorney sent a response on November 26, 2007, in which he asserted that "the CSE does not believe that [N.B.] can function adequately in an integrated classroom environment and effectively model the behavior of non-disabled peers." (IHO Ex. 5, at 3.) This assessment, Defendant's counsel insisted, was based on, "but not limited to, the results of standardized assessments and teacher devised tests, [N.B.'s] performance on meeting curriculum standards and IEP goals, teacher input and parent participation." (*Id.*)

In the winter and spring of 2008, an IHO conducted a six-day administrative hearing regarding the two due process complaints, in which he heard testimony and received evidence. (Decision of IHO Peter G. Albert, June 27, 2008 ("IHO Decision"), at 2.) The IHO found it "significant[ ]" that N.B.'s parents agreed with the CPSE's recommendation that N.B. attend a self-contained class at Keller for the 2006–07 school year (*id.* at 4), and imposed on N.B.'s parents "the initial burden of

17. Specifically, it is alleged that Ms. Teed agreed to a transfer because she "agreed with [Mrs. B.] that NB's needs were not being met" at Keller. (IHO Ex. 1, at 9.)

18. The second complaint was filed on November 12, 2007, and thus did not seek reimbursement as N.B. was not moved to Montessori until December 1. The District has not argued that this bars reimbursement for Montessori. Additionally, the IHO had notice that N.B. moved to Montessori in December 2007. (IHO Decision at 1.) Therefore, the issue of reimbursement for the costs of attending Montessori are properly considered by the Court.

proof to demonstrate, by a preponderance of the record evidence, that the recommendation of the school district was not appropriate." (*Id.* at 18–19.) While the IHO laid out the general standards for determining whether a child has been denied a Free Appropriate Public Education (FAPE) under IDEA (*id.* at 18–20), it only mentioned IDEA's specific requirement that disabled children be educated with non-disabled children "to the maximum extent appropriate," 20 U.S.C. § 1412(a)(5)(A), in a footnote late in the opinion. (*Id.* at 25 n. 10 (concluding that N.B.'s placement at BOCES would have "maximized the amount of mainstream opportunities to the extent appropriate for N").)[19] The IHO did not cite, much less apply, any legal test for determining whether a child has been mainstreamed to the maximum extent appropriate.[20]

After summarizing the testimony, the IHO found that "the record evidence demonstrated that N made academic and social progress while ... at the [Keller] school." (*Id.* at 22.) The IHO thus concluded that N.B.'s placement at Keller was

appropriate. (*Id.* at 24.) In the process, the IHO specifically rejected N.B.'s parents' complaints regarding Keller's use of the Applied Behavioral Analysis (ABA) methodology. (*Id.* at 22–23.) The IHO also determined that "[t]he record evidence ... supports the finding that the CSE recommendations for the 2007–2008 school year were appropriate." (*Id.* at 24.) The IHO explained that "the amount of individualized instruction provided to each student," in the BOCES class proposed for N.B., "was significant," and BOCES "would have provided N with appropriate mainstream opportunities via a 'reading buddy' program and a 'community-based instruction' program." (*Id.* at 25.) In a footnote, the IHO continued:

> Although the Parents claim that the recommended program at the BOCES North Garnerville school was not appropriate, in part because of its limited mainstream opportunities for N, it is noted that N had been recommended for and had attended self-contained programs for the years immediately preceding the commencement of this case.

**19.** The closest the IHO came to acknowledging this requirement in the text of the opinion was one sentence in which it noted that "an appropriate CSE recommendation must also be an educational program and placement in the 'least restrictive environment' consistent with federal and state requirements." (IHO Decision 20 (quoting 20 U.S.C. § 1412(a)(5).)).

**20.** Specifically, the IHO did not cite the two-pronged test which the Second Circuit adopted in *P. ex rel. P. v. Newington Bd. of Ed.*, 546 F.3d 111 (2d Cir.2008). Although *Newington* was not decided until months after the IHO issued its decision, the courts of several other circuits, as well as some courts within this circuit, had applied this test years before the Second Circuit explicitly adopted it in *Newington*. *See P. ex rel. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 113 (2d Cir.2008) (announcing that "[t]oday, we ... join several of our sister circuits" in their approach to IDEA's mainstreaming requirement); *L.B. ex*

*rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 976 (10th Cir.2004); *Sacramento City Unified Sch. Dist. v. Rachel H.*, 14 F.3d 1398, 1403–04 (9th Cir.1994); *Oberti ex rel. Oberti v. Bd. of Educ. of Clementon Sch. Dist.*, 995 F.2d 1204, 1215 (3d Cir.1993); *Greer v. Rome City Sch. Dist.*, 950 F.2d 688, 696 (11th Cir.1991); *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036 (5th Cir.1989); *Warton v. New Fairfield Bd. of Educ.*, 217 F.Supp.2d 261, 273 (D.Conn. 2002); *A.S. ex rel. S. v. Norwalk Bd. of Educ.*, 183 F.Supp.2d 534, 542 (D.Conn.2002). In fact, one court in this circuit faulted an IHO for not applying what is now known as the *Newington* test, even before *Newington* was decided. *See Warton*, 217 F.Supp.2d at 274, 276 n. 3 (refusing to defer to the IHO, in part, because the IHO found general education inappropriate "without articulating review of the *Oberti* factors" and without "specifically address[ing] the comparison of educational benefits" between general and special education).

Moreover, at the time of the CSE meeting in August 2007, N continued to exhibit significant deficiencies in several academic and social areas which could be addressed in a special education setting. Thus, based on the record evidence, I find that the recommended program at BOCES North Garnerville School was in the "lease [sic] restrictive environment" inasmuch as it maximized the amount of mainstream opportunities to the extent appropriate for N.

(*Id.* at 25 n. 10.) The IHO also found that, although N.B.'s "academic progress was more than minimally evident" at the time of the CSE meeting in August 2007, N.B. still "remained in need of special education." (*Id.* at 25–26.)

The IHO further held that N.B.'s parents did not provide sufficient evidence to show that the Montclair and Montessori programs were appropriate for N.B. (*Id.* at 27.) The IHO asserted that "the record evidence contained little information, documentation, or other evidence to illustrate the nature or components of the programs." (*Id.*) In particular, the IHO stressed that "no individual from either [school] . . . testified." (*Id.*) The IHO did note that it received N.B.'s June 2007 progress report from Montclair into evidence. (*Id.* at 27 n. 11.) But, it concluded that this thirty-one page document provided "few details or insight with respect to specifically how educational services were/are delivered to N, or her actual progress." (*Id.*) Finally, because the IHO ruled in favor of the District, it did not reach the question of whether Plaintiffs' damages should be equitably reduced. (*Id.* at 27–28.)

A State Review Officer (SRO) for the New York State Education Department denied Plaintiff's appeal. (Decision of State Review Officer Paul E. Kelly, Dec. 15. 2008 ("SRO Decision").) The SRO first noted that the New York Legislature amended the Education Law to place the burden of proof upon the school district in cases in which a parent is seeking tuition reimbursement for a unilateral placement. (*Id.* at 7 (citing N.Y. Educ. Law § 4404(1)(c).)) But, the SRO ruled that N.B.'s parents retained the burden of proof regarding the appropriateness of the 2006–07 placement because they filed their due process complaint regarding the 2006–07 placement before October 14, 2007, when the amendment to the Education Law took effect. The SRO went on to uphold the IHO's determination that both of the proposed placements complied with IDEA, and asserted that this ruling would be unchanged no matter which party bore the burden of proof. (*Id.* at 7–8.)

The SRO upheld N.B.'s 2006–07 placement at Keller because N.B. had "many opportunities to participate in activities with nondisabled peers throughout the school day," and made progress at Keller, and N.B.'s parents did not raise the concern that N.B.'s class at Keller was not integrated "at any time prior to their withdrawal" from Keller, nor "did they indicate such in their May, 7, 2007 due process complaint notice." (*Id.* at 11–12.) The SRO also upheld N.B.'s 2007–08 placement at BOCES, asserting that the placement "reflected the results of current standardized testing," and noting the IEP's determination that N.B. exhibited "significant delays in her speech-language, motor, social, and attentional skills, which interfered with her participation in age appropriate activities." (*Id.* at 15.) The SRO did not cite *P. ex rel. Mr. P. v. Newington Bd. of Ed.*, 546 F.3d 111 (2d Cir.2008), discussed *infra*, much less apply its test for determining whether a child has been mainstreamed to the maximum extent appropriate.

Plaintiffs filed this suit on February 10, 2009. (Dkt. No. 3.) Defendant answered

March 16, 2009. (Dkt. No. 4.) Both parties moved for summary judgment on November 16, 2009. (Dkt. Nos. 13–17.) The Court held oral argument on July 8, 2010. (Dkt. No. 18.)

## II. Discussion

### A. Standard of Review

■ Unlike an ordinary summary judgment motion, the existence of a disputed issue of material fact will not necessarily defeat a motion for summary judgment in an IDEA case. *See Viola v. Arlington Cent. Sch. Dist.*, 414 F.Supp.2d 366, 377 (S.D.N.Y.2006). Thus, while the parties "may call the procedure a motion for summary judgment, the procedure is in substance an appeal from an administrative determination, not a summary judgment." *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n. 3 (2d Cir.2005) (internal quotation marks and ellipse omitted); *see also Newington Bd. of Ed.*, 546 F.3d at 118 ("[W]hile our review is de novo, it is tinged with a significant degree of deference to the state educational agency, as we are essentially acting in an administrative-law-style capacity."); *Jennifer D. ex rel. Travis D. v. N.Y.C. Dep't of Educ.*, 550 F.Supp.2d 420, 429 n. 10 (S.D.N.Y.2008) (noting that motions for summary judgment in IDEA cases are not "directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed" (internal quotation marks and ellipsis omitted)).

Courts reviewing administrative decisions under IDEA must determine whether the decision is supported by " 'the preponderance of the evidence,' taking into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir.2003) (quoting 20 U.S.C. § 1415(i)(2)(C)(iii)); *see also M.S. ex rel. S.S. v. Bd. of Educ. of Yonkers*, 231 F.3d 96, 102 (2d Cir.2000), *abrogated on other grounds by Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57–58, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005). "In conducting this review, the [c]ourt may reject factual findings that are not supported by the record or are controverted by the record." *C.B. ex rel. W.B. v. N.Y. City Dep't of Educ.*, No. 02–CV–4620, 2005 WL 1388964, at *13 (E.D.N.Y. June 10, 2005).

The Supreme Court and the Second Circuit have cautioned "that IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir.2005) (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 205–08, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). "While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.' " *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir.1998) (quoting *Rowley*, 458 U.S. at 206, 208, 102 S.Ct. 3034) (internal quotation marks and brackets omitted); *see also Grim*, 346 F.3d at 383 ("[I]n violation of *Rowley*, the District Court impermissibly chose between the views of conflicting experts on a controversial issue of educational policy—effective methods of educating dyslexic students—in direct contradiction of the opinions of state administrative officers who had heard the same evidence."). Thus, courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review."

*M.S.*, 231 F.3d at 102 (internal quotation marks omitted).

■ "For a federal court to conduct an independent review of a challenged IEP without impermissibly meddling in state educational methodology, it must examine the record for any objective evidence" indicating that the defendant has violated the statute. *Walczak*, 142 F.3d at 130 (internal citations and quotation marks omitted). Thus, when a Court reviews the administrative record for objective evidence that a school district violated IDEA's "mainstreaming" requirement, it does not impose its own views of proper educational policy, rather, it enforces Congress's.[21] *See Oberti*, 995 F.2d at 1214 ("[T]he [IDEA] specifically 'requires participating States to educate handicapped children with nonhandicapped children whenever possible.' It is our duty to enforce that statutory requirement." (quoting *Rowley*, 458 U.S. at 202, 102 S.Ct. 3034) (internal citations omitted)); *Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 184 (3d Cir.1988) ("We do not read the Supreme Court's salutary warnings against interference with educational methodology as an invitation to abdicate our obligation to enforce the statutory provisions [of IDEA]."); *Lachman v. Ill. State Bd. of Educ.*, 852 F.2d 290, 294 (7th Cir. 1988) (noting that, while the Supreme Court has held that " 'once a court determines that the requirements of the [IDEA] have been met, questions of methodology are for resolution by the State,' " IDEA's "mainstreaming preference ... is one of the 'requirements of the Act' " (quoting *Rowley*, 458 U.S. at 208, 102 S.Ct. 3034)); *Jennifer D.*, 550 F.Supp.2d at 430 n. 11

(" '[T]he question is not one of methodology but rather involves a determination of whether the school district has satisfied the [IDEA's] requirement that handicapped children be educated alongside non-handicapped children to the maximum extent appropriate.' " (quoting *Roncker v. Walter*, 700 F.2d 1058, 1062 (6th Cir.1983) (internal ellipsis omitted))); *cf. Warton v. New Fairfield Bd. of Educ.*, 217 F.Supp.2d 261, 278 (D.Conn.2002) (overturning an IHO's ruling because "the School Board failed to rebut the presumption of an appropriate mainstream placement").

Courts are particularly unlikely to defer to administrative rulings that fail to thoroughly address IDEA's mainstreaming requirement. *See Oberti*, 995 F.2d at 1221 ("[T]he district court did not fail to give 'due weight' to the agency proceedings on this issue since the ALJ did not even consider whether the School District had made efforts to include [the disabled child] in a regular classroom with supplementary aids and services, as is required by IDEA."); *Jennifer D.*, 550 F.Supp.2d at 432 ("[T]he SRO's decision does not enumerate the relevant factors or engage in an analysis of whether the IEP provided for a placement in the least restrictive environment. Because the SRO did not make any findings on this issue, the decision of the SRO is not entitled to deference...."); *Warton*, 217 F.Supp.2d at 274–276 & n. 3 (declining to defer to the IHO, in part, because the IHO found general education inappropriate "without articulating review of the *Oberti* factors" and without "specifically address[ing] the comparison of educational benefits" between general and special education).[22]

---

**21.** "Educating a handicapped child in a regular education classroom ... is familiarly known as 'mainstreaming....' " *Daniel R.R.*, 874 F.2d at 1039.

**22.** The *"Oberti* factors" are now the *"Newington* factors" because the Second Circuit has

adopted the mainstreaming test which the Third Circuit articulated in *Oberti. See Newington Bd. of Ed.*, 546 F.3d at 113 (announcing that "[t]oday, we ... join several of our sister circuits" [including the Third Circuit] in their approach to IDEA's mainstreaming requirement).

## B. Analysis

IDEA "represents an ambitious federal effort to promote the education of handicapped children." *Rowley,* 458 U.S. at 179, 102 S.Ct. 3034. The statute provides federal assistance for education of children with disabilities and requires that states receiving such assistance provide disabled students with a "free appropriate public education" ("FAPE") in the "[l]east restrictive environment" ("LRE"), 20 U.S.C. § 1412(a)(1)(A), (5), and devise an IEP for each disabled student, *Rowley,* 458 U.S. at 181–82, 102 S.Ct. 3034. The IEP is crafted and revised by a team consisting of the child's parents, the child's regular-classroom teacher, a special-education teacher, a representative of the local educational agency, and other individuals with knowledge of the child. *See* 20 U.S.C. § 1414(d)(1)(B). The IEP must include a statement of the child's present level of academic and functional performance, measurable annual goals, special-education and supplemental services, and any program modifications for the child, along with an explanation of the extent to which the child will not participate with non-disabled children in regular classes and activities, a projected date for the beginning of any special supplementary services or modifications, and the anticipated frequency, location, and duration of such services and modifications. *See id.* § 1414(d)(1)(A)(I). In developing the IEP, the team must consider the child's strengths, the concerns of the parents, the results of the most recent evaluation of the child, and the academic, developmental, and functional needs of the child, along with other "special factors" particular to children with certain needs. *See id.* §§ 1414(d)(3)(A), (B). The local educational agency must ensure that the IEP is reviewed periodically, no less than annually, "to determine whether the annual goals for the child are being achieved," and to revise the IEP as needed based on the

child's progress and anticipated needs. *See id.* § 1414(d)(4)(A).

A child's parents must be notified of any change in a child's educational program, *see id.* § 1415(b)(3), and if a child's parents are dissatisfied with an IEP, they may file a complaint with the state's educational agency. *See id.* § 1415(b)(6). Such complaints are resolved at an "[i]mpartial due process hearing," *id.* § 1415(f), and any party aggrieved by the outcome may appeal to a state or federal court, *id.* § 1415(i)(2)(A), which will then "fashion appropriate relief based on its assessment of a preponderance of the evidence developed at the administrative proceedings and any further evidence presented by the parties," *Walczak,* 142 F.3d at 122–23.

 N.B.'s parents seek tuition reimbursement from the District on the baseline premise that N.B.'s 2006–07, and 2007–08 IEPs denied her a FAPE by, inter alia, failing to educate her along side non-disabled children "[t]o the maximum extent appropriate." 20 U.S.C. § 1412(a)(5)(A). Just last year, the Supreme Court reaffirmed that IDEA permits parents to seek reimbursement for the private placement of a child who was not offered a FAPE. *See Forest Grove Sch. Dist. v. T.A.,* ── U.S. ──, 129 S.Ct. 2484, 2496, 174 L.Ed.2d 168 (2009). Generally, tuition reimbursement for a private placement is warranted if: (1) "the proposed IEP was inadequate to afford the child an appropriate public education, and (2) ... the private education services obtained by the parents were appropriate to the child's needs." *Walczak,* 142 F.3d at 129 (citing, inter alia, *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.,* 471 U.S. 359, 370, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)); *see also Frank G. v. Bd. of Educ. of Hyde Park,* 459 F.3d 356, 363 (2d Cir.2006) (same). "Moreover, because the authority to grant reimbursement is dis-

cretionary, 'equitable considerations [relating to the reasonableness of the action taken by the parents] are relevant in fashioning relief.'" *Frank G.*, 459 F.3d at 363–64 (quoting *Burlington*, 471 U.S. at 374, 105 S.Ct. 1996) (alteration in original). Although the burden of proof under IDEA generally rests with the party seeking the impartial hearing, *see Schaffer*, 546 U.S. at 62, 126 S.Ct. 528, the New York Education Law has been amended so that the school district bears the burden of showing that the IEP was appropriate, while parents seeking tuition reimbursement retain the burden of showing that the private placement was appropriate. *See* N.Y. Educ. Law § 4404(1)(c); *see also Frank G.*, 459 F.3d at 364 ("Parents seeking reimbursement for a private placement bear the burden of demonstrating that the private placement is appropriate....").[23]

### 1. Whether the District's Placements of N.B. were Appropriate

The IDEA requires that,

> To the maximum extent appropriate, children with disabilities, ... are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). In enacting the IDEA, "Congress was concerned about the apparently widespread practice of relegating handicapped children to private institutions or warehousing them in special classes." *Sch. Comm. of Town of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 373, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *see also* Erin Phillips, Note, *When Parents Aren't Enough: External Advocacy in Special Education*, 117 Yale L.J. 1802, 1811 (2008) (noting that, before IDEA, disabled students "were separated from the general student population in special education or 'health conservation' classes, which were often located in basements or boiler rooms," and that "[s]chool officials regarded special education as day care"). Accordingly, "[i]n formulating an appropriate IEP, the CSE must ... be mindful of IDEA's strong preference for 'mainstreaming,' or educating children with disabilities '[t]o the maximum extent appropriate' alongside their non-disabled peers." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 108 (2d Cir.2007) (quoting 20 U.S.C. § 1412(a)(5) (alteration in original)); *see also Lachman*, 852 F.2d at 295 ("[IDEA's] requirement that mainstreaming be provided to the maximum extent appropriate indicates a very strong congressional preference." (emphasis omitted)).

 Still, the Second Circuit has been "mindful that the presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate

---

**23.** This amendment "app[ies] to impartial hearings commenced on or after" October 14, 2007. 2007 N.Y. Sess. Laws ch. 583 § 3 (McKinney). Since both of Plaintiffs' due process complaints were considered at a single IHO hearing commenced in 2008, the District bears the burden of proving that both the challenged placements were appropriate. The SRO wrongly imposed the burden of proof for the 2006–07 placement on N.B.'s parents because he mistakenly believed that the amendment only applied to due process complaints filed after October 14, 2007, rather than to impartial hearings commenced after that date. (SRO Decision 7–8.) That said, the SRO did note that he would have decided the question the same way regardless of the burden of proof. (*Id.*) Also, the SRO properly imposed on the District the burden of showing that its proposed placement of N.B. for the 2007–08 school year was appropriate. (*Id.*)

education to handicapped students." *Newington Bd. of Ed.,* 546 F.3d at 119 (internal quotation marks omitted). It thus has held that "where the nature or severity of the handicap is such that education in regular classes cannot be achieved satisfactorily, mainstreaming is inappropriate." *Briggs v. Bd. of Educ. of Conn.,* 882 F.2d 688, 692 (2d Cir.1989). Indeed, "courts have recognized some tension between IDEA's goal of providing an education suited to a student's particular needs and its goal of educating that student with his non-disabled peers as much as circumstances allow." *Id.* (citations omitted). This tension notwithstanding, "[t]he IDEA's preference for mainstreaming "rises to the level of a rebuttable presumption." " *Warton,* 217 F.Supp.2d at 273 (quoting *Sacramento City Unified Sch. Dist. v. Holland,* 786 F.Supp. 874, 877 (E.D.Cal.1992)).

■ To resolve this tension, the Second Circuit has adopted a two-part test, which is also employed by several other circuit courts, for determining whether an IEP provides the least restrictive environment possible. A court must ask: (1) "whether a student can be satisfactorily educated in the regular classroom with the benefit of supplemental aids and services;" and (2) if the school district was justified in removing the student from the mainstream classes, "whether the school has included the child in school programs with nondisabled children to the maximum extent appropriate." *See Newington Bd. of Ed.,* 546 F.3d at 121; *accord L.B. ex rel. K.B. v. Nebo Sch. Dist.,* 379 F.3d 966, 976 (10th Cir.2004); *Oberti,* 995 F.2d at 1215; *Daniel R.R.,* 874 F.2d at 1048. In applying the first prong, a court should consider (1) whether "reasonable efforts [were made] to accommodate the child in a regular classroom," (2) "the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits pro-

vided in a special education class," and (3) the potential "negative effects . . . on the education of the other students in the class." *Newington Bd. of Ed.,* 546 F.3d at 120 (internal quotation marks omitted); *accord L. ex rel. F. v. N. Haven Bd. of Educ.,* 624 F.Supp.2d 163, 180–81 (D.Conn. 2009).

■ Here, the record evidence convincingly demonstrates that placing N.B. in a self-contained classroom, both in 2006 and 2007, violated IDEA's requirement that she be educated with non-disabled children "to the maximum extent appropriate." First, the Court must determine whether "reasonable efforts [were made] to accommodate [N.B.] in a regular classroom." *Newington Bd. of Ed.,* 546 F.3d at 120 (internal quotation marks omitted). This is an important factor because "a school that has failed to give consideration to inclusion of a child in a regular class with supplementary aids and modifications has most likely violated the Act's mainstreaming directive." *Warton,* 217 F.Supp.2d at 275; *accord Oberti,* 995 F.2d at 1216. Further, "[t]he IDEA does not permit token gestures to accommodate disabled students." *Warton,* 217 F.Supp.2d at 275; *see also Daniel R.R.,* 874 F.2d at 1048 ("The Act does not permit states to make mere token gestures to accommodate handicapped students; its requirement for modifying and supplementing regular education is broad."). Regarding the 2006–07 placement, the IEP did not state whether the District considered any accommodations that would have allowed N.B. to continue attending school with non-disabled children. In fact, under the heading "Other Options Considered," each of the three 2006 IEPs stated that "a special education program . . . was rejected," because "it would be overly restrictive and [N.B.'s] needs could be met in a less restrictive environment." (District Admin. Exs. 9, 13,

19.) The District's witnesses never explained this contradiction, nor did its counsel when pressed at oral argument before this Court. The District's witnesses also failed to identify any accommodations which the CPSE considered that might have enabled N.B. to continue attending integrated classes for the 2006–07 school year. Certainly, there is no evidence in the record that integration with the use of a 1:1 aide was attempted, but failed. To the contrary, when N.B. attended a mainstream preschool for the 2005–06 year, her progress report was quite positive. N.B.'s teacher went out of her way to note that N.B. "has made many friends in class," and "is doing wonderfull [sic]." (SRO Ex. 6, at 1, 4.) "I am seeing such an improvement," she continued, "especially in her social skills." (*Id.* at 4.) The testimony of Ms. Sanchez and Mrs. B. corroborates this progress report, and the District offered no conflicting testimony.

The Keller School appears to have mostly integrated N.B.'s class, in spite of N.B.'s IEP. Dr. Nuzzolo's testimony and Ms. Teed's own notes establish that Ms. Teed was made aware of this. (Tr. 623; District Admin. Ex. 51.) Yet, she failed to convene the CPSE to consider whether there were any accommodations that it could make that would allow N.B. to continue in an integrated classroom. One such accommodation might have been the full-time 1:1 aide. This aide seems to have worked well both before and after N.B.'s attendance at Keller. Indeed, Dr. DeFina testified that a 1:1 aide was "paramount," and "probably one of the top things on the list" of N.B.'s educational needs. (Tr. 1128.) "[Y]ou can't get away with having this done within the context of a classroom situation in which there are one or two aides with a group of kids," he insisted, "the aide needs to work with her constantly." (*Id.*) Likewise, Ms. Sanchez and Mrs. B. also testified that a 1:1 aide has been essential to N.B.'s development. (Tr. 436, 440–41, 447, 556–57.) Instead of considering employing a 1:1 to help N.B. attend an integrated class, Ms. Teed apparently ignored the fact that N.B.'s class was effectively integrated. *Cf. A.S. ex rel. S. v. Norwalk Bd. of Educ.*, 183 F.Supp.2d 534, 543 (D.Conn. 2002) (noting that the school provided the student "with substantial supplemental aids and services," but still faulting it for failing "to consider a broader range of appropriate services (i.e., intensive instruction from a special education teacher and additional consultant time), prior to advocating for her removal from the regular education setting").[24]

For the 2007–08 year, the August 7, 2007 IEP recommended that N.B. attend a class with seven other disabled students because N.B. "required special instruction in an environment with a smaller student-to-teacher ratio and minimal distractions in order to progress in achieving the learning standards." (District Admin. Ex. 28, at 2.) Yet, neither the IEP nor any District witness stated whether the CSE considered accommodating N.B.'s need for a small class by placing her in a small, *integrated* classroom, like the classes she attended at Montclair and Montessori. Under the heading "Other Options Considered," the 8/7/07 IEP did note that

---

**24.** Because no party has suggested that a 1:1 aide was too expensive, the Court will not consider whether that defense is viable. *See Newington Bd. of Ed.*, 546 F.3d at 120 n. 4 ("We need not consider in this case whether costs should be taken into account because the Board has not raised the issue as a defense. Accordingly, we leave that question for another day."); *cf. L.B.*, 379 F.3d at 977 ("This court need not decide whether costs of mainstreaming should be one of the factors considered in the LRE test because [the school district] has explicitly disclaimed on appeal that cost concerns determined the placement and services it offered to K.B.")

"[t]he Committee considered a general education setting with support services," but rejected it "because [N.B.'s] current academic functioning, social needs, physical needs and language processing needs indicates [sic] that a more intensive setting with support is needed to address [N.B.'s] needs." (*Id.* at 7.) Yet, this boilerplate, conclusory language cannot satisfy the requirement that the CSE "serious[ly] consider[ ] . . . including the child in a regular class with such supplementary aids and services [as appropriate]." *Oberti,* 995 F.2d at 1216; *see also A.S.,* 183 F.Supp.2d at 544 ("[T]he cited testimony is simply too broad and vague to reasonably support the conclusion that the Board in fact considered providing direct assistance from a special education teacher in the regular education classroom, an increased role for the Board's consultants, or the other supplemental services identified by [the student's] experts.").

Similarly, Ms. Teed testified that "[a]s opposed to a fully-integrated program, the 8:1:2 [self-contained] program would provide different models of instruction, individualized instruction, [and] opportunities for therapists to work with [N.B.] within her setting." (Tr. 915.) Ms. Teed stated that the BOCES program was "most appropriate for N . . . due to the small size of the program, the structured parts of that program, [and the] opportunities that program provided for N. to learn and grow, [and] meet her needs." (Tr. 938.) But, there is no evidence that the CSE considered whether these attributes of the BOCES program (or, at least some of these attributes) could also be offered an integrated setting. *See Briggs,* 882 F.2d at 692 ("In a case where the segregated facility is considered superior, the court should determine whether the services which make that placement superior could be feasibly provided in a non-segregated setting."); *see also Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H.,* 14 F.3d 1398, 1401, 1405 (9th Cir.1994) (upholding trial court's finding that a disabled student would benefit from regular education, because, inter alia, the Board's evidence "focused on [the student's] limitations but did not establish that the educational opportunities available through special education were better or equal to those available in a regular classroom").

Moreover, in August 2007, the CSE was aware that N.B. had spent the past semester in an integrated class at Montclair, that N.B.'s progress report from Montclair was generally positive, and that N.B.'s parents were satisfied with her progress there. (District's Admin. Ex. 76.) Yet, the IEP did not state why, or even whether, the Montclair placement (or anything like it) was inappropriate. And, if Ms. Teed is to be believed, the CSE was not even aware that N.B.'s Fall 2006 Keller class was effectively integrated, much less did it consider whether, with accommodations, a similar placement would be appropriate. *See A.S.,* 183 F.Supp.2d at 544 (faulting the CSE-equivalent for placing a child in a special education class "without the benefit of knowing how [the child] was actually faring in the regular education environment").

Second, the Court must compare "the educational benefits available to the child in a regular class, with appropriate supplementary aids and services," with "the benefits provided in a special education class." *Newington Bd. of Ed.,* 546 F.3d at 120. In making this comparison, "the Court must consider . . . 'those unique benefits the child may obtain from integration in a regular classroom which cannot be achieved in a segregated environment, i.e., the development of social and communication skills from interaction with nondisabled peers.'" *Warton,* 217 F.Supp.2d at 275 (quoting *Oberti,* 995 F.2d at 1216).

Because "[i]ntegrating a handicapped child into a nonhandicapped environment may be beneficial in and of itself," the Court's "inquiry must extend beyond the educational benefits that the child may receive in regular education." *Daniel R.R.*, 874 F.2d at 1049. For example, "the language and behavior models available from non-handicapped children may be essential or helpful to the handicapped child's development," so that, even if the child cannot "absorb all of the regular education curriculum, he may benefit from nonacademic experiences in the regular education environment." *Id.* at 1047–48; *see also A.S.*, 183 F.Supp.2d at 545–46 (noting that courts should pay attention to communication and social skills developed in integrated classrooms). Accordingly, "a placement which may be considered better for academic reasons may not be appropriate because of the failure to provide for mainstreaming." *Roncker ex rel. Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir.1983); *see also Oberti*, 995 F.2d at 1216–17 (noting that, because of the non-academic benefits of mainstreaming, "a determination that a child with disabilities might make greater academic progress in a segregated, special education class may not warrant excluding that child from a regular classroom environment" (emphasis omitted)).

In order for the scales to tip in favor of an integrated environment, the Court need only determine that, "with appropriate support and services," N.B. could "make progress toward [her] IEP goals in the regular education setting." *Warton*, 217 F.Supp.2d at 275–76; *see also Daniel R.R.*, 874 F.2d at 1047 ("If the child's individual needs make mainstreaming appropriate, we cannot deny the child access to regular education simply because his educational achievement lags behind that of his classmates. . . . Thus, the decision whether to mainstream a child must include an inquiry into whether the student will gain any educational benefit from regular edu-

cation."); *A.S.*, 183 F.Supp.2d at 546 ("[T]he appropriate yardstick is whether [the child], with appropriate supplemental aids and services, can make progress towards her IEP goals in the regular education setting.").

One way of measuring the benefits of a placing a particular child in an integrated class is to look at the progress he or she in fact made in such classes. *See Walczak*, 142 F.3d at 130 ("A review of objective evidence [of a student's progress] is easiest, of course, when a disabled child is in a mainstream class."); *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 991 (1st Cir.1990) ("[A]ctual educational results are relevant to determining the efficacy of educators' policy choices."); *Jennifer D.*, 550 F.Supp.2d at 432 (noting that the child's behavior "in the period from November 2005 through the development of the January 2006 IEP strongly supports the conclusion that he was capable of being educated in a community school . . . if he was afforded special education services"). In conducting this inquiry, courts look to evidence of the student's academic progress both before and after the school attempted to place the student into a segregated class. *See, e.g., Warton*, 217 F.Supp.2d at 276 ("Plaintiff's evidence of his subsequent success in the mainstream program with appropriate supports is relevant to this consideration."). The "attainment of passing grades and regular advancement from grade to grade are generally accepted indicators of satisfactory progress." *Walczak*, 142 F.3d at 130; *see also Rowley*, 458 U.S. at 207 n. 28, 102 S.Ct. 3034 (finding that disabled student's ability to achieve passing marks and her advancement from grade to grade "was an important factor" in determining whether the student could be appropriately mainstreamed).

Here, the evidence demonstrates that N.B. made satisfactory progress during each of the three years that she attended

school with non-disabled children. As the Court has already noted, N.B. received an excellent progress report for the 2005–06 year from both her teacher (SRO Ex. 6) and her speech theorist, (SRO Ex. 2). Likewise, Ms. Sanchez and Mrs. B. testified to N.B.'s progress during that year. This evidence is uncontradicted. In the fall of 2006, N.B. attended a class at Keller that was mostly integrated and, at least according to her teacher and the District, she made progress. (Tr. 738.)

N.B. attended an integrated class at Montclair from February to December 2007, and again achieved encouraging results, as N.B.'s progress reports were largely positive. (SRO Ex. 7; District Admin. Ex. 76.) Also, Ms. Sanchez and Mrs. B. testified to N.B.'s social and academic success at Montclair. (Tr. 1299, 1493–95.) Again, there is nothing in the record to contradict this evidence. After having to move to Montessori for financial reasons, N.B. continued to improve; Ms. Sanchez and Mrs. B. both noted progress. (Tr. 1301–11, 1519–26.) And Dr. DeFina testified that in the Montessori school N.B. "has been able to [model appropriate social types of interactions] and most recently she is starting to initiate interactions with her peers." (Tr. 1110.) Perhaps most significantly, there is no record of any of N.B.'s teachers or aides at any of the four schools at which she attended integrated (or effectively integrated) classes ever suggesting that it was inappropriate for N.B. to have attended school with typically-developing children.

Another way courts can objectively weigh the benefits of integrated versus segregated classes for a given child is by considering the opinions of experts who are familiar with the child. *See Warton*, 217 F.Supp.2d at 276 (faulting the hearing officer for discounting plaintiff's psychologist's "evaluation that [the child] would benefit from an inclusive educational environment, particularly from contact with mainstream peers"). Here, the District did not produce a single witness, expert or otherwise, who supported Ms. Teed's view that, even with accommodations, placing N.B. in an integrated classroom would be inappropriate.

To the contrary, several expert witnesses testified that an integrated classroom would be appropriate for N.B., provided that she receive sufficient accommodations. Most notably, Dr. DeFina testified that N.B. was "at a critical stage" where she needed "good role models" to "interact with in order to develop appropriate social skills." (Tr. 1123.) Because "modeling behaviors" she observes is one of N.B.'s strengths (Tr. 1199), Dr. DeFina testified that it is "very critical" to "put her into a program where there are ... neurotypical kids in which [she] can model appropriate social types of interactions, (Tr. 1110). Dr. DeFina thus called an integrated program, "paramount," "very important in overall learning," the "best in [N.B.'s] particular case," and certainly "appropriate for her." (Tr. 1152.) By contrast, Dr. DeFina testified that a self-contained class like BOCES, which only integrates disabled students for lunch, gym, and play-dates, would be inappropriate for N.B. (Tr. 1124–25.) "You want to maximize her exposure" to typically-developing children, "not minimize it," he explained. (Tr. 1125.)

Ms. Sanchez agreed with this assessment (Tr. 1306–07), noting N.B.'s ability to learn from her peers, (Tr. 425–26). Likewise, Mrs. B. has been a forceful proponent of an integrated education for N.B., explaining that integration is essential for N.B. because she "does a lot by watching first." (Tr. 1522.) "[S]he will watch you and most people don't realize she is taking it all in but she is," her mother explained. (Tr. 1522.) Like Dr. DeFina, Mrs. B. has

also stressed "the socialization skills that [N.B. gets] from being with [non-disabled] children." (Tr. 1523.) "[Y]ou can't ... get that in any other environment," Mrs. B. asserted. (Tr. 1523.) While Mrs. B. does not have the academic credentials of someone like Dr. DeFina, she is an expert when it comes to the development and learning style of her own daughter, and nothing to which she testified was inconsistent with the experts' testimony. *See* Phillips, *supra*, at 1815–16 (noting that, under IDEA, parents play "the role of the child-specific expert," because they are "uniquely situated to provide a global understanding of the child's abilities," and are able to "report on a child's progress in ways a teacher cannot").

The proposition that an integrated class was appropriate for N.B. was also supported by a number of *District* witnesses. For instance, Dr. Nuzzolo, the director of the Keller school, testified that, after evaluating N.B., she and her team selected N.B. for the 6:1:2 class "because that was the class that [Keller] had targeted to become an integrated class," and the team believed it was "appropriate" for N.B. to be in an integrated class. (Tr. 641–42.) Then, when Keller's certification to run an integrated class was delayed, Dr. Nuzzolo gave the go-ahead to effectively integrate N.B.'s class, and testified that the effective integration was successful. (Tr. 648–50.) Indeed, Dr. Nuzzolo even went so far as to place her non-disabled daughter into a class with N.B. (Tr. 647–48, 659.) Likewise, N.B.'s teacher at Keller, also a District witness, considered it appropriate for N.B. to be in the effectively integrated class. (Tr. 738.) Finally, and perhaps most significantly, Dr. Blechman, the assistant principal at BOCES, and the person upon whose recommendation the CSE's decision to send N.B. to a self-contained class was partially based (Tr. 823–24), also considered N.B. capable of attending an integrated class. Dr. Blech-

man testified that the class which he recommended for N.B. was intended for disabled children who "are able to be in a regular school." (Tr. 790.) Dr. Blechman explained that, even though these children could attend an integrated school, he thought a self-contained classroom is better, noting that "we found that just being in a regular school puts pressures on a child." (*Id.*) While the Court does not doubt that Dr. Blechman has good reasons to support his broad preference for special education, this preference is at odds with IDEA, especially as it applies to N.B.

In sum, the record evidence strongly supports a conclusion that an integrated class would be far more beneficial for N.B. than a self-contained class. At the very least, the District has failed to rebut the presumption that an integrated class is appropriate. *See A.S.,* 183 F.Supp.2d at 548 ("Even were the court to assume that the Board's proposed plan would be a viable and effective placement for [the student], in that she could make progress [there] ..., what would still be missing from the Board's argument is evidence that A. could not, with appropriate supplemental aids and services, make the same or even more progress in the regular education setting."); *see also Jennifer D.,* 550 F.Supp.2d at 433 (ruling for plaintiff where defendant's expert "did not testify with respect to whether [the child] could be maintained in a less restrictive environment").

Finally, courts must consider the potential "negative effects ... on the education of the other students in the class." *Newington,* 546 F.3d at 120 (internal quotation marks omitted). In evaluating this factor, the child must be significantly disruptive in order justify removing him or her from a mainstream classroom. *See L.B.,* 379 F.3d at 978 (noting that, "although [the autistic child] had some behavioral problems such as tantruming," she "was not

disruptive in the regular classroom," and, therefore, the negative effects factor "weighs in favor" of mainstreaming the child); *Oberti,* 995 F.2d at 1222–23 (holding that although "[t]he School District presented numerous witnesses before both the ALJ and the district court who testified to [the student's] extremely disruptive behavior," the "district court did not abuse its discretion in deciding not to defer" to the IHO's finding that the student was sufficiently disruptive to justify placing him in a self-contained class); *Warton,* 217 F.Supp.2d at 277 (finding the student not sufficiently disruptive despite the fact that "the science teacher contended that plaintiff's participation was disruptive and presented dangers to the other students" because the disruption occurred in an inappropriate placement); *A.S.,* 183 F.Supp.2d at 549 ("[W]hile the record certainly reflects that, at various times, [the student] experienced behavioral difficulties in the regular education setting, the record is considerably less clear concerning whether such behavioral problems resulted in disruption or negative effects to the regular education environment.").

Here, there is no evidence that N.B. negatively impacted other students. In fact, Dr. Nuzzolo chose to place her own typically-developing daughter into a class with N.B. (Tr. 647–48.) Moreover, courts have noted that non-disabled children benefit from exposure to disabled children like N.B. *See A.S.,* 183 F.Supp.2d at 547 ("Mainstreaming also serves the important goal of '[t]eaching nondisabled children to work and communicate with children with disabilities,' so as to 'eliminate the stigma, mistrust and hostility that have traditionally been harbored against persons with disabilities.'" (quoting *Oberti,* 995 F.2d at 1217 n. 24) (alteration in *A.S.*)). Accordingly, the "disruptive" factor also counts against placing N.B. in a segregated classroom. *See Warton,* 217 F.Supp.2d at 277 (finding the mainstreaming requirement was not satisfied when, among other things, the record did not support the conclusion that the student "would present [behavioral] difficulties if provided with an adequate level of supplementary aids and related services"). Therefore, having carefully considered the *Newington* factors, the Court finds that the District has not met its burden of demonstrating that its proposed placements for N.B. were appropriate.[25]

25. At times, the District defends its 2006–07 placement by asserting, despite Ms. Teed's testimony to the contrary, that Keller "combined students from the Keller School's day care program with the preschool students in N.B.'s self-contained class for all but one-half hour each day and provided N.B. with the opportunity to participate in activities with these non-disabled peers throughout the school day." (Def.'s Mem. 10.) Accordingly, the District argues, "[t]he Keller School included N.B. in school programs with nondisabled [sic] children to the maximum extent possible." (*Id.*) Even putting aside the anomaly of the District's arguing that its IEP complied with IDEA only because Keller school officials ignored its requirement that N.B. be placed in a self-contained class until otherwise directed by the CSE (District Admin. Ex. 9, at 5; Tr. 261, 268–74), the argument fails for at least three reasons. First, the statute requires the District to educate disabled children with non-disabled children "[t]o the *maximum* extent appropriate." 20 U.S.C. § 1412(a)(5)(A). The District failed to show that educating N.B. in an actual integrated classroom would be "inappropriate." It follows that educating her in a self-contained classroom, and then surreptitiously adding four non-disabled daycare students into the classroom for most of the school day is not integration to "[t]he maximum extent appropriate." *Id.* (emphasis added). Second, it is undisputed that Ms. Teed offered to allow N.B. to transfer out of Keller, but, consistent with N.B.'s 10/3/06 IEP, only to a self-contained classroom. (Tr. 1697–1700.) Third, to the extent that N.B.'s Keller class was integrated, it violated IDEA's mandate that N.B. receive "[a] free appropriate public edu-

The Court recognizes that this finding conflicts with that of the IHO and SRO. The Court does not overturn such decisions lightly. However, in addition to the overwhelming evidence demonstrating that N.B. was capable of attending an integrated class if provided with sufficient accommodations, there are a number of factors suggesting that deference to the IHO and SRO is not appropriate here. First, while "[d]eference is particularly appropriate when the state hearing officers' review has been thorough and careful," *Newington Bd. of Ed.*, 546 F.3d at 118 (internal quotation marks and ellipsis omitted), here the IHO and SRO made a number of errors. The IHO incorrectly placed the burden of demonstrating that an integrated class was appropriate on N.B.'s parents. (IHO Decision at 18–19.) The IHO relegated his discussion of IDEA's mainstreaming requirement to a footnote, and based his decision on the incorrect assertion that N.B. "had been recommended for and had attended self-contained programs for the years immediately preceding the commencement of this case." (IHO Decision at 25 n.10.) The IHO also noted that "the record evidence demonstrated that N made academic and social progress while . . . at the [Keller] school." (*Id.* at 22.) But, because the IHO seemed to have

ignored the overwhelming evidence that Keller was effectively integrated, it did not recognize that this fact actually cuts the other way, indicating that N.B. was capable of attending an integrated class. The SRO upheld N.B.'s 2007–08 placement at BOCES because it "reflected the results of current standardized testing." (SRO Decision at 15.) The record does contain the results of N.B.'s standardized tests, but those scores are hardly dispositive because the District submitted no evidence to suggest that a child with N.B.'s scores could not or should not be mainstreamed. The SRO also based its decision on the 8/7/07 IEP assertion that N.B. exhibited "significant delays in her speech-language, motor, social, and attentional skills which interfered with her participation in age appropriate activities." (*Id.* at 15.) Yet, the SRO did not account for the fact that N.B.'s 2005 IEPs made nearly identical findings but still determined that a self-contained class would be overly restrictive. Nor did the SRO properly consider expert testimony that, because of N.B.'s modeling strengths, her above-mentioned weaknesses could be addressed in a mainstream classroom.

Second, courts are unlikely to defer to administrative rulings that fail to thoroughly address IDEA's mainstreaming re-

cation," *id.* § 1412(a)(1)(A), that is, an education that provides "special education and related services tailored to meet the unique needs of a particular child, [which are] 'reasonably calculated to enable the child to receive educational benefits.'" *Walczak*, 142 F.3d at 122 (quoting *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034 (internal quotation marks and citations omitted)). The District did not produce a single witness to support the Keller school's unilateral decision to effectively integrate the classes without providing N.B. with a 1:1 aide. To the contrary, the District's position in this suit is that it would be inappropriate to place N.B. in an integrated class *even with* a 1:1 aide. Moreover, the Parents' witnesses testified that N.B. needed a 1:1 aide in order to render an integrated classroom

appropriate (Tr. 1128), that a 1:1 aide has been essential to N.B.'s development (Tr. 436, 440–41, 447, 556–57), and, conversely, that the lack of such an aide at Keller was detrimental, (Tr. 411–12, 1285–86). Thus, even if the Court were to find that N.B.'s class at Keller was the equivalent of a normal, formally integrated classroom, and ignore the fact that both N.B.'s IEP and Ms. Teed prevented her from transferring to a formally integrated classroom, the District would still have violated IDEA. The District would satisfy IDEA's LRE provision, but violate its FAPE provision by placing N.B. in an integrated class without a 1:1 aide—a situation that no one (besides, presumably, the official who made that decision) thinks is appropriate.

quirement. *See Oberti*, 995 F.2d at 1221 ("[T]he district court did not fail to give 'due weight' to the agency proceedings on this issue since the ALJ did not even consider whether the School District had made efforts to include [the disabled child] in a regular classroom with supplementary aids and services, as is required by IDEA."); *Jennifer D.*, 550 F.Supp.2d at 432 ("[T]he SRO's decision does not enumerate the relevant factors or engage in an analysis of whether the IEP provided for a placement in the least restrictive environment. Because the SRO did not make any findings on this issue, the decision of the SRO is not entitled to deference...."); *Warton*, 217 F.Supp.2d at 274–76 & n. 3 (refusing to defer to the IHO, in part, because the IHO found general education inappropriate "without articulating review of the [*Newington*] factors" and without "specifically address[ing] the comparison of educational benefits" between general and special education). Here, neither the IHO nor the SRO cited *Newington* (or another court's formulation of the test adopted in *Newington*), must less applied *Newington's* three factor test. Accordingly, their claim for deference is weakened.

Finally, courts defer to administrative agencies "on matters of educational policy," *Cerra*, 427 F.3d at 191, because courts are not viewed as institutionally competent to handle such questions, *Rowley*, 458 U.S. at 206–08, 102 S.Ct. 3034. But, when a Court reviews the administrative record for objective evidence that a school district violated IDEA's "mainstreaming" requirement, it does not impose its own views of proper educational policies and methods,

rather, it enforces the statute enacted by Congress. *See Polk*, 853 F.2d at 184 ("We do not read the Supreme Court's salutary warnings against interference with educational methodology as an invitation to abdicate our obligation to enforce the statutory provisions [of IDEA]."); *Lachman*, 852 F.2d at 294 (noting that, while the Supreme Court has held that " 'once a court determines that the requirements of the [IDEA] have been met, questions of methodology are for resolution by the State,' " IDEA's "mainstreaming preference . . . is one of the 'requirements of the Act' " (quoting *Rowley*, 458 U.S. at 208, 102 S.Ct. 3034)); *Jennifer D.*, 550 F.Supp.2d at 430 n. 11 ("[T]he question is not one of methodology but rather involves a determination of whether the school district has satisfied the [IDEA's] requirement that handicapped children be educated alongside non-handicapped children to the maximum extent appropriate." (internal quotation marks and ellipsis omitted)); *cf. Warton*, 217 F.Supp.2d at 278 (overturning an IHO's ruling because "the School Board failed to rebut the presumption of an appropriate mainstream placement, and the hearing officer's decision is not supported by the preponderance of evidence in the record"). Here, the Court need not and does not address any question of educational policy.[26] It simply notes that no witness supported Ms. Teed and her committee's decision that it would be inappropriate to place N.B. in an integrated classroom (with appropriate supplemental services), that several witnesses opposed it, and that the uncontradicted evidence showed that N.B. succeeded in such classrooms for three years.[27]

---

26. For example, the Court has not strayed into the debate between the parents and the District over which teaching method, "ABA" or "DIR–Floortime," would best suit N.B. (Tr. 151–53, 220, 411–19, 461–62, 541, 598–607, 748, 804–05, 1113–22.)

27. Because the Court finds that N.B.'s 2006–07 and 2007–08 placements violated IDEA's mainstreaming requirements, it need not determine whether those placements also violated IDEA's more general requirement that each student receive a FAPE. *See L.B.*, 379 F.3d at 975 (noting that because it deter-

## 2. Whether the Parents' Placements of N.B. were Appropriate

 Even if the District's IEP failed to comport with the IDEA, the Court must separately determine whether "the private education services obtained by the parents were appropriate to the child's needs." *Walczak*, 142 F.3d at 129 (citing, inter alia, *Burlington*, 471 U.S. at 370, 105 S.Ct. 1996) ("[A]n award will be entered in [the parents'] favor if it appears (1) that the proposed IEP was inadequate to afford the child an appropriate public education, and (2) that the private education services obtained by the parents were appropriate to the child's needs."); *see also Gagliardo*, 489 F.3d at 112 ("Parents who seek reimbursement bear the burden of demonstrating that their private placement was appropriate, even if the IEP was inappropriate."). "Subject to certain limited exceptions, 'the same considerations and criteria that apply in determining whether the school district's placement is appropriate should be considered in determining the appropriateness of the parents 'placement.'" *Gagliardo*, 489 F.3d at 112 (quoting *Frank G.*, 459 F.3d at 364) (internal brackets omitted). Thus, "[t]o determine the appropriateness of parental placement, courts must apply the *Rowley* standard, that is, whether the private placement is reasonably calculated to enable the child to receive educational benefit." *C.B.*, 2005 WL 1388964, at *16 (internal quotation marks omitted). Notably, "the standard applied to . . . parental placements is less restrictive and subject to fewer constraints than that applied to the school authorities." *Id.* For example, "[t]he parents' unilateral placement need not have certified special education teachers or an IEP for the disabled student in order to qualify as appropriate." *Gabel ex rel. L.G. v. Bd. of Educ. of the Hyde*

*Park Cent. Sch. Dist.*, 368 F.Supp.2d 313, 326 (S.D.N.Y.2005) (citing *Florence County Sch. Dist. v. Carter*, 510 U.S. 7, 14, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993)); *see also Frank G.*, 459 F.3d at 364 (noting that "[a]n appropriate private placement need not meet state education standards"). In sum, a "private placement meeting this standard is one that is 'likely to produce progress, not regression.'" *Gagliardo*, 489 F.3d at 112 (quoting *Walczak*, 142 F.3d at 130).

 Evidence of the student's progress at the unilateral placement is relevant to this inquiry. *See id.* at 115; *Frank G.*, 459 F.3d at 366–67. " 'Grades, test scores, and regular advancement . . . constitute evidence that a child is receiving educational benefit. . . .' " *Gagliardo*, 489 F.3d at 112 (quoting *Frank G.*, 459 F.3d at 364). As noted above, there is extensive and uncontradicted evidence the N.B. progressed, both academically and socially, at Montclair and Montessori. Still, "[n]o one factor is necessarily dispositive in determining whether parents' unilateral placement is reasonably calculated to enable the child to receive educational benefits," and courts will "consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs." *Frank G.*, 459 F.3d at 364 (internal quotation marks omitted).

 Because school districts are sometimes concerned that parents might assert an IDEA violation as a pretext to obtain a private education for their child at public expense, courts examine the private placement to determine whether the benefits it offers are "specifically designed to meet the unique needs of a handicapped child," or simply "the kind of educational and environmental advantages and amenities that might be preferred by parents of any

mined that the district violated "IDEA's substantive LRE provision, this court need not address whether [the district] provided [the child] with a FAPE").

child, disabled or not." *Gagliardo,* 489 F.3d at 115 (internal quotation marks and emphasis omitted). Therefore, "'a unilateral private placement cannot be regarded as proper under the IDEA when it does not, at a minimum, provide some element of special education services in which the public school placement was deficient.'" *Frank G.,* 459 F.3d at 365 (quoting *Berger v. Medina City Sch. Dist.,* 348 F.3d 513, 523 (6th Cir.2003) (internal quotation marks and brackets omitted)). While the Sixth Circuit in *Medina* held that the private placement's offering one element the absence of which caused the public placement to violate IDEA was a "minimum," courts generally uphold private placements where such an element is present, at least where there is also evidence that the student progressed at the private school. *See Frank G.,* 459 F.3d at 365–66 (noting that "[t]he small class size offered at [the private school] was one element ... necessary to address a significant deficiency in the inappropriate public school placement," but asserting the court "need not decide that small class size alone rendered the [private] placement appropriate" because the private school offered other accommodations and there was evidence that the student progressed there); *L.B.,* 379 F.3d at 979 (finding that the private placement was appropriate because the district "violated the IDEA by failing to provide [the student] with an LRE," and the student "benefitted significantly, both academically and non-academically, from her private mainstream preschool"); *Knable ex rel. Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 770–71 (6th Cir.2001) (holding that a unilateral private placement was appropriate where, inter alia, class sizes were small, the student made significant educational progress, and his grades and behavior improved significant-ly); *Jennifer D.,* 550 F.Supp.2d at 436 (finding private placement appropriate where "plaintiff relies not only on the evidence of [the student's] progress ..., but also on the testimony of several special education professionals that the [private] program was designed to meet [the student's] particular needs").

█ The Court has held that N.B.'s IEP for the 2006–07 school year violated IDEA because it placed Mrs. B. in a Catch–22, where she could either leave N.B. in an effectively integrated classroom without accommodations, or move her to a self-contained class. There is evidence that, even though Keller was effectively integrated, the school did not offer N.B. a 1:1 aide. (Tr. 1490.) As noted, this was a significant deficiency because it is undisputed that N.B. could not progress as well in an integrated classroom without such an aide. To remedy this problem, N.B.'s parents placed her in an integrated program, with a 1:1 aide. (IHO Ex. 1, at 11; Tr. 908, 1294, 1517–19.) The Court also has held that N.B.'s IEP for the 2007–08 school year (as well as her options for the spring of 2007, should she leave Keller) violated IDEA by denying her the opportunity to attend class with her non-disabled peers. The private placements remedied this problem by placing N.B. in an integrated classroom. (IHO Ex. 1, at 10; Tr. 908, 1294, 1517–19.) In fact, Mrs. B. searched every school within a sixty-mile radius for one with a full-day integrated program, because that was her "main" goal. (Tr. 1697–1700.) Accordingly, because N.B. progressed in her private placements, and because those placements remedied deficiencies in her public placements, the Court finds that N.B.'s private placements "were appropriate to the child's needs." *Walczak,* 142 F.3d at 129.[28]

28. The IHO made the opposite finding, noting that "there is insufficient evidence" to determine that the private placement is appropri-ate, because "the record evidence contained little information ... to illustrate the nature

So long as the private placement remedies a significant deficiency in the public placement, and the student progresses in the private placement, a court will not fault the parents simply because they chose a school that has other appealing features as well. *See Jennifer D.,* 550 F.Supp.2d at 436 (holding that the private placement was appropriate "because it was specially designed to meet [the student's] needs, irrespective of his ability to participate in ice hockey," and noting that "[t]he defendant cites to no cases in support of the proposition that a plaintiff should be denied reimbursement for an otherwise appropriate placement due to the fact that the placement also afforded the student additional benefits beyond those required by the IDEA"). Nor do courts attempt to read parents' minds to determine whether they removed their child from the public school because of the school's IDEA violations, or because the school was deficient in some other regard not covered by IDEA. *See id.* (refusing to consider "the defendant's attempt to defeat the plaintiff's [IDEA] claim by asserting that the motive behind the [private] placement" was "the availability of ice hockey," and noting that "[t]he availability of ice hockey ... is not a relevant consideration"). Thus, because N.B.'s private placements remedied her public placement's IDEA violations, and because N.B. progressed in her private placements, it does not matter whether N.B.'s parents removed her from Keller, in part, because it used the "ABA" methodology, or whether her parents chose Montclair and Montessori, in part,

---

or components of the programs," and "no individual from either [school] testified at the hearing." (IHO Decision at 27.) The IHO did note that N.B.'s June 2007 Montclair progress report was received into evidence. (*Id.* at 27 n. 11 (citing District Admin. Ex. 76).) But, it insisted that this thirty-one page document provided "few details or insight with respect to specifically how educational services were/are delivered to N, or her actual progress." (*Id.*) This finding is perplexing. N.B.'s Montclair progress report contained *extensive* information regarding N.B.'s program and progress. (District Admin. Ex. 76.) For instance, the report specified the makeup of the classroom (i.e., the number of students, their ages, etc.), and the teaching methods used. (*Id.* at 1.) It also explained precisely how N.B. was taught each subject. (*Id.* at 1–3.) The report noted the frequency and method in which the school employed speech therapists, occupational therapists, interactive story-telling, music, and controlled play. (*Id.* at 1–3.) The report gave N.B. grades in a number of areas, including "Self–Regulation and Attention," and "Two–Way Communication." (*Id.* at 4.) It provided a list a goals for N.B. and strategies for achieving them. (*Id.* at 5–10.) The report concluded by commenting on N.B.'s progress towards each goal (*id.* at 11–30), noting, for instance, that N.B. "doesn't ignore her peers" (*id.* at 18), "fol- lows two-step directions during music and story times" (*id.* at 20), and "uses single word," and, sometimes, "two-word utterances," (*id.* at 22). Further, although the record does not contain a progress report from the Montessori school, there was ample testimony before the IHO regarding the nature of that program and N.B.'s success there. That testimony came from N.B.'s mother, who frequently observed N.B. at Montessori (Tr. 1519–26), from Ms. Sanchez, who worked with N.B. during that time (Tr. 449– 50, 1309–10), and Dr. DeFina, who has monitored N.B. during her time at Montessori and is familiar with the nature of the program, (Tr. 1147–48). Notably, the IHO's brief discussion of the appropriateness of N.B.'s private placement did not explain what aspects of the programs the testimonial and documentary evidence left to be desired. *Cf. Newington Bd. of Ed.,* 546 F.3d at 118 ("Deference is particularly appropriate when the state hearing officers' review has been thorough and careful." (internal quotation marks and ellipsis omitted)). Accordingly, the Court does not defer to the IHO on this point. Because the SRO did not rule on this question, the Court does not defer to it on this point either. *See Jennifer D.,* 550 F.Supp.2d at 432 ("Because the SRO did not make any findings on this issue, the decision of the SRO is not entitled to deference. . . .").

because they used the "Floortime" methodology.

### 3. Whether the Parents' Reimbursement Should be Equitably Reduced

"Any party aggrieved by the findings and decision" of an IHO or SRO in an IDEA case, has "the right to bring a civil action ... in a district court of the United States." 20 U.S.C. § 1415(i)(2)(A). In such actions, a court "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). This language "means that equitable considerations are relevant in fashioning relief" under IDEA. *Burlington*, 471 U.S. at 374, 105 S.Ct. 1996. Thus, "courts retain discretion to reduce the amount of a reimbursement award if the equities so warrant." *Forest Grove Sch. Dist.*, 129 S.Ct. at 2496; *see also Burlington*, 471 U.S. at 369, 105 S.Ct. 1996 ("The ordinary meaning of these words confers broad discretion on the court.").

Specifically, the parents' reimbursement "may be reduced or denied if ... 10 business days ... prior to the removal of the child from the public school, the parents did not give written notice to the public agency." 20 U.S.C. § 1412(a)(10)(C)(iii) (internal punctuation omitted); *see also Forest Grove Sch. Dist.*, 129 S.Ct. at 2496 (noting that it may be appropriate to "reduce the amount of a reimbursement award if ... the parents failed to give the school district adequate notice of their intent to enroll the child in private school"). This notice must state that the parents are "rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense." 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(aa). The record in-

dicates that Mrs. B. telephoned Ms. Teed on January 10, 2007 to inform her that Mrs. B. removed N.B. from Keller effective January 2, 2007, eight days earlier, and that she intended to enroll N.B. at Montclair by the end of January 2007. (SRO Ex. 9; Tr. 167.) Ms. Teed wrote Mrs. B. a letter confirming this (SRO Ex. 9), but there is no record of Mrs. B ever sending the District written notice stating her concerns about Keller.[29] Accordingly, Plaintiffs' reimbursement should be reduced for failure to provide proper notice before removing N.B. from Keller.

Reimbursement may also be reduced "if, prior to the parents 'removal of the child from the public school, the public agency informed the parents ... of its intent to evaluate the child ..., but the parents did not make the child available for such evaluation." 20 U.S.C. § 1412(a)(10)(C)(iii)(II); *see also C.G. v. Five Town Cmty. Sch. Dist.*, No. 05–CV–237, 2007 WL 494994, at *30 (D.Me. Feb. 12, 2007), *adopted by* 2007 WL 1051650 (D.Me. Apr. 6, 2007) (noting that whether the parents' tuition reimbursement should be reduced depends on whether "they 'removed' [their child] from public school ... prior to receiving written notice ... of the District's request to conduct evaluations"), *aff'd*, 513 F.3d 279 (1st Cir.2008). The District contends that N.B.'s parents "refuse[d] to consent to a psychological evaluation of her as requested by the CSE." (Def.'s Mem. 21–22.) Although the District provides no citation to the record to support this statement, it appears that it refers to N.B.'s triennial evaluation, which was due August 23, 2007. (Tr. 885.) In mid-January 2007, Mrs. B. asked Ms. Teed if she could move this evaluation up, but then ultimately decided to have it per-

---

**29.** Mr. and Mrs. B. objected to N.B.'s 2007–08 placement on the record at the 8/7/07 CSE meeting (Tr. 913), thus providing sufficient notice of their intent to reject that IEP. *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(aa).

formed privately by Dr. DeFina. (Tr. 884–86, 888, 896; Parents Admin. Ex. B.)[30] Starting on January 26, 2007, the District made three requests to Plaintiffs for permission to have their daughter evaluated by a psychologist retained by the District. (Tr. 888–894.) Plaintiffs did not respond to these requests. (*Id.*) But, there is no evidence that the District asked for this evaluation before N.B.'s parents removed her from Keller on January 2, 2007. Thus, because a refusal to submit to a public evaluation will only result in a reduction of reimbursement where *"prior* to the parents' removal of the child from the public school, the public agency informed the parents ... of its intent to evaluate the child," 20 U.S.C. § 1412(a)(10)(C)(iii)(II) (emphasis added), Plaintiffs' reimbursement should not be reduced for failure to consent to a psychological evaluation.

Finally, reimbursement may be reduced "upon a judicial finding of unreasonableness with respect to actions taken by the parents." *Id.* § 1412(a)(10)(C)(iii)(III). Ms. Teed testified that on July 30, 2007, she requested Plaintiffs 'permission to share N.B.'s educational records with a neuropsychologist retained by the District. (Tr. 895.) Because Plaintiffs' did not immediately respond, Ms. Teed asked their permission again a week later at the 8/7/07 CSE meeting. (Tr. 898–99.) Ms. Teed stated that Plaintiffs' attorney indicated that she would not allow her clients to sign the authorization at that time because she had not yet reviewed the forms. (*Id.*) At that meeting, the CSE issued the last IEP at issue. While the CSE did not have the benefit of the requested records, it did have the advice of Dr. Blechman and his

staff at BOCES. (Tr. 823–24.) Plaintiffs allowed Dr. Blechman and his BOCES team to evaluate their daughter at the District's request, even though Plaintiffs were opposed to sending N.B. to a self-contained program, like the one BOCES offered. (Tr. 910.) Moreover, the CSE had access to N.B.'s June 2007 Montclair progress report, a thirty-one page document. (District's Admin. Ex. 76.) Finally, Ms. Teed testified that, despite Plaintiffs' alleged lack of cooperation, the CSE had "sufficient [information] to make a determination" regarding N.B. at its August 7, 2007 meeting. (Tr. 941–92.) While Plaintiffs should have responded promptly to Ms. Teed's request for N.B.'s educational records, Ms. Teed may also be faulted for not requesting those records until one week before the CSE meeting. *See Patricia P. v. Bd. of Educ. of Oak Park,* 203 F.3d 462, 469 (7th Cir.2000) ("[A] school district is [ ] also bound by the IDEA's preference for a cooperative placement process...."). The evidence does not support a finding that the absence of these records materially harmed the decision making process, in fact, Ms. Teed testified to the contrary. *Cf. M.S. v. Mullica Twp. Bd. of Educ.,* 485 F.Supp.2d 555, 568 (D.N.J.2007) (reducing parents reimbursement where they "refused to cooperate with the [school district] to such an extent that the [school district] was unreasonably prevented from creating an IEP"), *aff'd,* 263 Fed.Appx. 264 (3d Cir.2008). Accordingly, the Plaintiffs' reimbursement should not be reduced for failure to consent to the release of N.B.'s educational records. *See Warren G. ex rel. Tom G. v. Cumberland Cnty. School Dist.,* 190 F.3d 80, 85–86 (3d

---

**30.** Because Dr. DeFina did not issue his report until December 6, 2007 (Parents' Admin. Ex. B), it was not available for the CSE's 8/7/07 meeting at which it determined N.B.'s placement for the 2007–08 school year. Still, Ms. Teed testified that, even without an up-to-

date psychological evaluation, the CSE had "sufficient [information] to make a determination" that N.B. should be placed in a self-contained class for the 2007–08 school year. (Tr. 941–92.)

Cir.1999) (reversing the district court's reduction of reimbursement, despite the administrative panel's finding that parents made "unrealistic and unreasonable demands, provid[ed] inaccurate information, contradict[ed] themselves and ma[de] false accusations against the District," because "[t]he conduct of parents should not be permitted to defeat the purpose of the Act").

### 4. Whether Plaintiffs' Exhausted Their Administrative Remedies

The SRO upheld N.B.'s 2006–07 placement at Keller, in part, because N.B.'s parents did not raise the concern that N.B.'s class at Keller was not integrated "at any time prior to their withdrawal" from Keller nor "did they indicate such in their May 7, 2007 due process complaint notice." (SRO Decision at 11.) To the extent that this is a finding that Plaintiffs did not properly raise the issue of whether N.B.'s proposed placement for the Spring of 2007 violated IDEA's mainstreaming requirement, it is misguided.

■■■■ IDEA requires that a due process complaint contain "a description of the nature of the problem of the child relating to such proposed initiation or change, including facts relating to such problem; and a proposed resolution of the problem to the extent known and available to the party at the time." 20 U.S.C. § 1415(b)(7)(A)(ii). Further, "[t]he party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the notice." Id. § 1415(f)(3)(B). "IDEA requires an aggrieved party to exhaust all administrative remedies before bringing a civil action in federal or state court. . . ." J.S. ex rel. N.S. v. Attica Cent. Schs., 386 F.3d 107, 112 (2d Cir.2004); see also Polera v. Bd. of Educ. of the Newburgh Enlarged City Sch. Dist., 288 F.3d 478, 490 (2d Cir.2002) ("[The] disabled-student plaintiffs . . . should not be permitted to 'sit on' live claims and

spurn the administrative process that could provide the educational services they seek, then later sue for damages."). Exhaustion is required "so that disputes related to the education of disabled children are first analyzed by administrators with expertise in the area who can promptly resolve grievances." J.S., 386 F.3d at 112. This " 'affords full exploration of technical educational issues, furthers development of a complete factual record, and promotes judicial efficiency.' " Id. (quoting Polera, 288 F.3d at 487).

Here, Plaintiffs' first due process complaint noted that N.B. had attended "a neuro-typical preschool" prior to the 2005–06 year, and alleged that "it was agreed by all of the special education professionals present" at the 2005 CPSE meetings, "that NB needed to be in a 'full day, integrated program.' " (IHO Ex. 1, at 5 (emphasis in original).) After noting several deficiencies in the Keller school, the complaint avers that the District offered to let N.B. leave Keller, but only if she attended a school on a list provided by the District, "none of [which] . . . had a full-day integrated learning program." (Id. at 8.) The complaint insists that N.B. "clearly needed" an integrated program and that it was "counter-productive" for N.B. to continue at Keller. (Id. at 9–10.) Thus, N.B.'s parents placed her at Montclair because, they claimed, it was "[t]he only other appropriate school we could identify for NB with a full-day integrated learning program using sensory-based learning." (Id. at 10.) The due process complaint concludes with Mrs. B.'s assertion that "NB has a one-on-one teaching assistant who works with her on a daily basis at the Montclaire [sic] school, and as NB's mother, I have noticed a dramatic improvement." (Id. at 11.) The complaint's proposed solution was that N.B. "[c]ontinue [her] program at Montclaire [sic] with tuition reimbursement." (Id. at 3.)

The District's response justified N.B.'s placement by asserting that N.B. improved at Keller, but still needs to "develop prerequisite skills in order to be able to function in larger group settings." (IHO Ex. 4.) The letter further noted that "other NYS approved preschools ... were considered and rejected as Mrs. [B.] was unwilling to consider a non-integrated class setting." (*Id.*) N.B.'s parents sent a second impartial hearing request on November 12, 2007, seeking to amend their first complaint to challenge N.B.'s 2007–08 placement as well. This second complaint attacked N.B.'s 2007–08 placement, inter alia, because it "fail[ed] to provide for any mainstreaming," which was assertedly inappropriate because N.B. "functions adequately in an integrated classroom environment and models effectively from non-disabled students." (IHO Ex. 2, at 4.) The complaint then insisted that N.B. "should be within an integrated classroom," and that she "requires a one to one aide." (*Id.* at 5.)

As noted, the IHO combined these complaints and heard extensive testimony on, among other issues, whether the CPSE agreed to place N.B. in a self-contained or an integrated class for the 2006–07 year, and on whether N.B.'s class at Keller was in fact integrated. The IHO also heard testimony that Keller did not provide N.B. with a 1:1 aid to accompany her to class, even though she had such an aide at every other school she attended, and her Keller teacher recommended such an aide. (Tr. 1490.) Moreover, Ms. Sanchez testified that N.B. was often ignored at Keller (Tr. 411–12, 1283–87), and often did not have "any assistance from an aide or a teacher to kind of support her to be able to engage in what the other kids were doing," (Tr. 412).

Accordingly, the issue of whether the District offered to educate N.B. alongside non-disabled children to the maximum extent appropriate (including a 1:1 aide) during the 2006–07 year was properly raised before the IHO. To be sure, this issue is a bit confusing due to the odd fact pattern upon which it is based, viz., the facts that the 10/3/06 IEP recommended a self-contained class, the class was "effectively integrated" in violation of the IEP, the CPSE chairperson testified this effective integration did not occur, and that the CPSE chairperson placed Mrs. B. in a Catch–22 where she could either transfer her daughter to a self-contained class, or leave her in the effectively integrated class without the accommodations she needed. But, this obscure fact pattern was largely created by the District, not N.B.'s parents. Moreover, even though the SRO "noted" that Plaintiffs did not allege that N.B.'s 2006–07 placement violated IDEA's mainstreaming requirement in their first due process complaint, he considered that claim nonetheless. (SRO Decision, at 11–12.) Thus, Plaintiffs did exhaust that claim.

In fact, it is the District that raises an argument before this Court that it did not press before the IHO and SRO. The District seeks to avoid responsibility for its 6/5/06 IEP, which improperly recommended that N.B. attend a self-contained class, by pointing out that Keller officials ignored the IEP by effectively integrating N.B.'s class without the CPSE's permission. (Def.'s Mem. 10.) Yet, the District's brief to the SRO asserted just the opposite, that "[i]n her special class at the Keller School, N.B. was suitably grouped for instructional purposes with children having similar needs and abilities." (Def.'s Mem. of Law Submitted to the Office of State Review, Sept. 3, 2008, at 7.) The Court has noted that the District's new argument fails, among other reasons, because, if the Keller class was integrated, it would violate IDEA's FAPE requirement by failing to provide that 1:1 aide that every witness (except maybe Dr. Nuzzolo)

testified she needed in order to succeed in an integrated class. The Court is comfortable making this observation, even though Plaintiffs' first due process complaint did not explicitly fault Keller for failing to provide N.B. with a 1:1 aide, because, based on the totality of Plaintiffs' due process complaints and the IHO record, Plaintiffs' position was clear: N.B. needed an integrated classroom with a 1:1 aide.[31]

### III. Conclusion

For the foregoing reasons, the Court grants Plaintiffs' motion for summary judgment and denies Defendant's cross-motion for summary judgment. The Clerk of the Court is respectfully directed to terminate the pending motion. (Dkt. No. 13.) The Parties should submit briefs, within thirty days, addressing Plaintiffs' damages (including the extent to which they should be equitably reduced), and whether an injunction should issue.

SO ORDERED.

---

**31.** To the extent the SRO suggested that Plaintiffs' reimbursement claim for the spring of 2007 is barred because N.B.'s parents did not raise the concern that her class at Keller was not integrated "at any time prior to their withdrawal" from Keller (SRO Decision at 11), it was mistaken. First, as noted, the District responded to Plaintiffs' May 7, 2007, due process complaint by noting that "Mrs. [B.] was unwilling to consider a non-integrated class setting." (IHO Ex. 4.) Second, that N.B.'s class at Keller was clandestinely integrated may have made complaining that it was insufficiently integrated rather awkward for N.B.'s parents. But, even assuming that N.B.'s parents unjustifiably failed to complain to Keller officials or to the CPSE before removing their daughter, this would not bar their claim for failure to exhaust administra-

tive remedies. See J.S., 386 F.3d at 112 (noting that exhaustion is required "so that disputes related to the education of disabled children are first analyzed by administrators"). Rather, Plaintiffs' alleged failure to cooperate, at most, suggests that their damages should be equitably reduced. See 20 U.S.C. § 1412(a)(10)(C)(iii)(III) (stating that reimbursement may be reduced "upon a judicial finding of unreasonableness with respect to actions taken by the parents"); Forest Grove Sch. Dist., 129 S.Ct. at 2496 (noting that district courts may, in their discretion, reduce the damages of parents who "immediately enroll their children in private school without first endeavoring to cooperate with the school district"). The District may address this issue in supplemental briefing.